**Gordon Y. BILLARD and Edith Citron, on behalf of themselves and others similarly situated, Plaintiffs-Appellants,**

v.

**ROCKWELL INTERNATIONAL CORPORATION and Lehman Brothers Kuhn Loeb Incorporated, Defendants-Appellees.**

**No. 941, Docket 81-7920.**

United States Court of Appeals, Second Circuit.

Argued April 1, 1982.
Decided June 30, 1982.

Stanley L. Kaufman, New York City (Kaufman, Taylor & Kimmel, New York City, Kelly, Black, Black & Earle, and Kenny, Nachwalter & Seymour, P. A., Miami, Fla., on brief), for plaintiffs-appellants.

Donald I. Strauber, New York City (Edwin D. Scott, Terry A. Thompson, Shana R. Conron, Chadbourne, Parke, Whiteside & Wolff, New York City, on brief), for defendant-appellee, Rockwell Intern. Corp.

Edward J. Nowak, New York City (Jayma M. Meyer, Simpson Thacher & Bartlett, New York City, on brief) for defendant-appellee Lehman Bros. Kuhn Loeb Inc.

Before FEINBERG, Chief Judge, WINTER, Circuit Judge, and MISHLER, District Judge.*

RALPH K. WINTER, Circuit Judge:

This appeal raises issues as to the obligation of corporate insiders to disclose information in their possession before announcing a tender offer. The case was brought in the District Court under Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n(e) (1976).[1]

---

\* Honorable Jacob Mishler, Senior United States District Judge of the Eastern District of New York, sitting by designation.

1. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on

It also involves certain pendent state law claims. Because the transactions at issue have been the subject of extensive litigation in another forum, *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981), the parties were able to supplement the pleadings in the District Court with documentation fleshing out the issues. Judge Lasker dismissed the complaint, 526 F.Supp. 218 (S.D.N.Y.1981), and this appeal followed.

We affirm.

## BACKGROUND

At issue are certain transactions in securities issued by Collins Radio Company, an Iowa corporation ("Collins"). During the 1960's, Collins was a prosperous company, its shares trading at least as high as $60. Near the end of the decade, however, Collins encountered severe financial reversals, its share price falling in 1971 to as little as $9.75 per share. With Collins on the verge of bankruptcy in August, 1971, its shareholders approved an agreement with the defendant, Rockwell International Corporation ("Rockwell"), under which Rockwell provided managerial assistance, invested $35 million in Collins, and guaranteed $20 million of sales on credit to MCI Leasing, Inc., thereby enabling MCI to purchase over $30 million of Collins equipment. In return, Collins issued to Rockwell two new series of securities in addition to its common stock: (i) an issue of preferred stock convertible into Class A common stock and (ii) warrants to purchase additional Class A common stock. The preferred stock issued to Rockwell had the power to elect a major-ity of the Collins board of directors, which Rockwell exercised. Moreover, the agreement prohibited Collins from paying dividends upon its common stock during the period relevant to the complaint. At the time of the agreement, the Collins shareholders were expressly informed that Rockwell might merge Collins into it if circumstances made such a transaction financially attractive.

Collins continued to experience substantial losses during 1971 and well into 1972. During the later months of 1972 and early 1973, however, its fortunes reversed. Collins' financial statement of May 31, 1973, showed that sales for the previous three quarters had exceeded total sales for all of fiscal 1972. On August 9, 1973, its common stock closed on the New York Stock Exchange at 21¼. On August 10, at a regularly scheduled meeting, Rockwell's board of directors decided to make a tender offer for all the outstanding shares of Collins common stock at $25 per share and, if two-thirds of those shares were tendered, to merge Collins into Rockwell. At the time of this decision, Rockwell owned no Collins common stock and, under Iowa law, had to obtain two-thirds of that class to effectuate a statutory merger. Iowa Code § 496A.70 (1970). Rockwell's public announcement stated:

> Collins is demonstrating substantial earnings improvement and we believe its future performance will be strong.

> In the tender offer we will furnish preliminary financial results for Collins' 1973 fiscal year as well as information relating to forecasts of future performance.

a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The [Securities and Exchange] Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

On August 15, Rockwell mailed a letter to each common stockholder which contained a copy of the August 10 announcement. The letter also stated:

> We will send you in the near future detailed information on the offer and about Collins' financial results and projections and its business. You should consider that information carefully before you act. PLEASE TAKE NO ACTION AT THIS TIME. WAIT FOR THE FORMAL TENDER OFFER AND THE LETTER OF TRANSMITTAL.

On August 20, Rockwell formalized the tender offer. The offering material is conceded to have fully disclosed all available financial information on Collins' 1973 fiscal year. The offer remained open for 40 days and specifically provided for withdrawal rights. In the end, about 75% of the total outstanding shares of Collins common stock were tendered and purchased by Rockwell. Having acquired more than two-thirds of Collins common stock, Rockwell engineered a statutory merger of Collins into itself for a cash price of $25 per share. Under the Iowa short form merger statute, dissenting shareholders of Collins had no right of appraisal. Iowa Code §§ 496A.77, 496A.78 (1970).

This action was filed in September, 1973, by two former holders of Collins common stock, one of whom tendered shares in response to the Rockwell offer, the other of whom received $25 per share in the course of the merger. The complaint alleges that at the time of the August 10 announcement of the tender offer, Rockwell controlled the Collins board and was in possession of unpublicized financial information about Collins' 1973 fourth quarter earnings.[2] It further alleges that if that information had been disclosed prior to the announcement of the tender offer, the price of Collins common stock would have risen at least to $35.[3]

The gravamen of the complaint is that the August 10 announcement "froze" the price of Collins shares at $25, since traders thereafter knew that if Rockwell's offer were successful, it would effect a short form merger and pay only $25 for the remaining outstanding shares. Disclosure of the financial information after the announcement of the offer could not, therefore, cause share price to rise to its true value of $35.

The complaint also alleges that Lehman Brothers Kuhn Loeb Incorporated ("Kuhn Loeb"), Rockwell's dealer-manager for the offer, knew and advised Rockwell that if the financial information were disclosed, the price of Collins common stock would rise to a minimum of $35 per share. Kuhn Loeb also issued an opinion, contained in the formal tender offer, that the $25 price was fair. Plaintiffs claim that this opinion constituted a material misrepresentation in violation of Sections 10(b) and 14(e).

A variety of pendent state claims based on these facts were also stated.

## DISCUSSION

### A. The "Freeze" Issue

Reduced to essentials, plaintiffs' argument is that Rockwell's announcement of the tender offer at $25 per share, without prior disclosure of the favorable financial information for the final quarter of the 1973 fiscal year, imposed a "freeze" on the price of Collins shares at $25. We need not accept this argument as true for purposes of this appeal since it is not a factual allegation but merely inferential argument. See 2A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶ 12.08 at 2266–69 (1982).

■ We find the argument thoroughly implausible. At the time of the August 10 announcement, no shareholder could tender

---

2. Since Collins' fourth quarter ended only on August 3, no claim is made that information which would have been published in the ordinary course of affairs was deliberately withheld until the tender offer was formalized. If anything, the decision to make the tender offer precipitated an earlier than usual disclosure.

3. Although we decide this case on other grounds, we note that much of the information released on August 20 merely confirmed projections published in May.

shares. By August 20, the earliest time at which Collins common stock could be permissibly tendered, all available financial information had been fully disclosed. Moreover, for another 40 days after that disclosure, every shareholder was free to withdraw any previous tender. The August 10 announcement of the tender offer could not have "frozen" the price of Collins shares at $25 unless the market regarded that price as accurately reflecting the value of the shares. Any shareholder believing on the basis of the disclosure that the $25 price undervalued the Collins shares had only to decline to tender. If the offer failed, such a shareholder could expect either a renewed, higher offer from Rockwell or plaintiffs' predicted increase in share price to at least $35. Anyone sharing plaintiffs' optimistic view of Collins shares would feel fully protected in declining to tender since, even if the offer were successful, the floor price would be $25. On the other hand, shareholders believing that $25 approximated or exceeded the true value would perceive a risk in refusing to tender since the price might remain at 21¼, or even decline. The critical decision of the shareholders was thus made during the course of the tender offer and well after disclosure of the financial material in question. Plaintiffs' attack is not so much upon Rockwell's conduct as upon the judgment of the Collins shareholders.

Plaintiffs' claim is simply a description of the hopes of offerors. Every offeror hopes to "freeze" the stock price of the target company by making the lowest bid which will succeed. Rockwell no doubt profoundly hoped that $25 would suffice to attract two-thirds of the Collins common stock, for it owned none itself and a failure to garner that super-majority would defeat its plan, causing it either to abandon the merger or increase its offer. Any resultant "freeze" is nothing more than a judgment by shareholders that the bid reflects true value or better. *Lewis v. Oppenheimer & Co.*, 481 F.Supp. 1199, 1209 (S.D.N.Y.1979). A

"freeze" is thus in no sense inevitable, and tender offers made at a premium above market price not infrequently cause share prices to rise above the offering price as the market anticipates competing offers or increases in the initial bid.[4]

◼ Plaintiffs seek to distinguish the present case from tender offers generally because, they assert, a "White Knight" would not attempt to compete with Rockwell's bid so long as Rockwell had the power to select a majority of the Collins board. The restrictions on dividends, they also argue, left Collins shareholders with little incentive to hold their shares in the face of Rockwell's offer. Even if true, that fact is unrelated to the claimed violation of the securities laws in failing either to disclose the favorable financial information or to withhold announcement of the tender offer.

The fact that Rockwell's control and the restrictions on dividends affected the price of Collins common stock is the direct result of the 1971 agreement between Rockwell and Collins, which the Collins shareholders approved with relief since it avoided a likely bankruptcy. Whether that transaction was fair or not is irrelevant to the claimed violations of Sections 10(b) and 14(e), *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Rockwell's ability to offer a low bid as a consequence of the prior agreement thus adds nothing to the Sections 10(b) and 14(e) claims.

Plaintiffs seek to bring this case within our decision in *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). We held there that Rule 10b–5 prohibited trading by insiders possessing confidential information which had been released but had not appeared on the Dow Jones broad tape and thus was not yet in the public domain. In that case, however, we were talking about a matter of minutes,

---

4. *See, e.g., Wall Street Journal*, June 3, 1980 at 14, col. 2 (owner of 47% of MGM announced a tender offer to purchase another 1,450,000 shares of MGM at $5 per share; on that day, the price of MGM shares rose to $8.25 although no competing offer was announced).

whereas plaintiffs here argue that the tender offer should have been delayed for several days after the announcement of the financial information for Collins' fourth quarter. As Judge Lasker quite rightly noted, the tender offer here was open for fully 40 days after release of the information, and both shareholders and arbitrageurs had ample opportunity to absorb and digest it. We also agree with Judge Lasker that

> if an insider is required to disclose all of its inside information *prior to announcing* an offer, it may have to delay the offer indefinitely, as new events occur and their impact on the market is awaited. Such a rule could effectively preclude insiders from trading in the securities of their companies.

526 F.Supp. at 220.

Such a rule might also create legal dilemmas for insiders. The decision to make the tender offer for Collins common stock was made at a regularly scheduled meeting of the Rockwell board. To have concealed this decision until the financial information was in a fully publishable form might well have violated New York Stock Exchange regulations requiring quick release of information affecting share price.[5] Shareholders of Collins who sold their shares for less than $25 between August 10, 1973 and the ultimate announcement of the tender offer would hardly regard Rockwell's concealment of its intentions as beneficial to them. Preserving confidentiality about such a matter is no easy task, moreover, and we have no doubt that Collins shareholders who sold too soon would construct claims against Rockwell at least as plausible as the one before us. *Cf. Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

■ Finally, plaintiffs argue that the failure to withhold announcement of the tender offer was a "manipulative device" prohibited by the securities laws. We need

only look to *Sante Fe, supra,* to see the lack of merit in this claim. The Court said there:

> 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' ... The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially effecting market activity.

430 U.S. at 476–77, 97 S.Ct. at 1302, citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976).

Announcement of a genuine tender offer in no way creates an artificial impact on market activity. No potential trader is led to believe there is a ready market for shares when none in fact exists and the activity of the offeror is not designed to achieve anything other than the success of the offer. Plaintiffs' argument thus falls of its own weight.

### B. *Material Misrepresentations as to Kuhn Loeb's Advice*

Paragraph 18 of the Amended Complaint states:

> Rockwell's tender offer of August 20, 1973, contains the opinion of Kuhn that the price of $25 per share was fair and equitable to Collins' shareholders. Kuhn knew, however, and indeed had so advised Rockwell, that Rockwell's public announcement of August 10, 1973 had manipulated and artificially depressed the price of Collins' stock which, in the absence of such planned and intentional manipulation, would rise to a minimum price of $35 per share.

■ Although the fairness of the offering price is not a valid basis for an action under Sections 10(b) and 14(e), *Santa Fe, supra,* a statement that experts have exam-

---

**5.** N.Y.S.E. Company Manual, Section A2, Part 1, reads:

> A corporation whose securities are listed on the New York Stock Exchange Inc. is expected to release quickly to the public any news or information which might reasonably be

expected to materially affect the market for those securities. This is one of the most important and fundamental purposes of the listing agreement which each corporation enters into with the Exchange.

ined the price and certified it as fair may well be a material misrepresentation if those experts have advised the offeror that the price is unfair. If adequately pleaded, therefore, such facts would state a claim for relief.

We hold that there has not been an adequate allegation of such facts. Rule 9(b) of the Federal Rules of Civil Procedure reads:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.

This Court has previously construed Rule 9(b) strictly in order to minimize strike suits, to protect defendants, particularly accountants and other professionals, from harm to their reputation resulting from ungrounded actions, and to give defendants notice of the precise conduct in issue. *See, e.g., Felton v. Walston & Co.*, 508 F.2d 577, 580 (2d Cir. 1974); *Segal v. Gordon*, 467 F.2d 602, 606–608 (2d Cir. 1972); *Denny v. Barber*, 576 F.2d 465, 468–70 (2d Cir. 1978); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, at 113–114 (2d Cir. 1982).

■ There is an obvious tension between the requirements of Rule 9(b) and the practicality of alleging in elaborate detail facts constituting fraud prior to discovery. We need not decide whether the complaint before us would be sufficient in a case where no discovery has been had, for plaintiffs here have had access to full discovery. Plaintiffs' counsel were also counsel in *Broad v. Rockwell, supra,* and Billard was a designated expert in that case. Plaintiffs in *Broad* had full discovery of all documents relating to Kuhn Loeb's activities and advice in connection with Rockwell's tender offer for Collins shares. Although plaintiffs here have supplemented the record with materials developed through discovery in *Broad*, they have failed to produce any supporting detail for their general allegation of fraud relating to Kuhn Loeb. In these circumstances, an allegation of fraud which fails to state the time, place, persons responsible and other details surrounding

Kuhn Loeb's alleged advice to Rockwell is insufficient. The policies underlying Rule 9(b) call upon us to require greater precision than is found in this complaint when full discovery has been had in a prior case.

### C. *The Pendent State Claims*

■ Plaintiffs argue that Judge Lasker's dismissal of the pendent state claims was an abuse of discretion because any actions commenced at this time would be time barred. Defendants, however, have assured us at oral argument that they will waive any defense based on the statute of limitations for the period during which this action has been pending and for a reasonable time thereafter to allow plaintiffs to institute state court litigation. In view of that representation, we affirm Judge Lasker's dismissal of the pendent claims.

Affirmed.