In re UNIVERSAL FOUNDRY
COMPANY, Debtor.

Paul G. SWANSON, Trustee, Appellee,

v.

FIRST WISCONSIN FINANCIAL
CORPORATION, Appellant.

No. 92–C–1291.

United States District Court,
E.D. Wisconsin.

Dec. 8, 1993.

Reinhart, Boerner, Van Deuren, Norris & Rieselbach by Mark L. Metz, Milwaukee, WI, for appellant/cross-appellee.

Kersten & McKinnon by E. Campion Kersten and Paul G. Swanson, Trustee, Milwaukee, WI, appellee/cross-appellant.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

The appellant, First Wisconsin Financial Corporation, [FWFC], now known as Firstar Bank of Milwaukee, appeals from the January 21, 1992, judgment entered by United States bankruptcy judge Charles N. Clevert which avoided a transfer to FWFC from the debtor, Universal Foundry Company [Universal], on the ground that it was a preferential transfer under 11 U.S.C. § 547(b). The trustee, Paul G. Swanson, has filed a cross-appeal from (1) an interlocutory order of June 24, 1988, which dismissed his equitable subordination claim against FWFC and First Wisconsin National Bank [Bank]; and (2) an order entered on October 13, 1992, denying the trustee's motion to amend the judgment with respect to the rate of prejudgment interest fixed by the bankruptcy court.

### I. Background

Universal filed a petition for reorganization under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq., on September 5, 1984. A trustee was appointed but the reorganization efforts advanced by Universal ultimately failed. In January 1985, the case was converted to a proceeding under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 et seq. After the resignation of two interim trustees, Mr. Swanson was appointed trustee to liquidate Universal's assets.

The trustee commenced an adversary proceeding on September 4, 1986, alleging that two of Universal's creditors, the Bank and FWFC, (1) received preferential transfers under 11 U.S.C. § 547(b) of $303,652 during the 90 days preceding Universal's filing of its bankruptcy petition, and (2) were "insiders" of Universal and received preferential transfers under 11 U.S.C. § 547(b) in unknown amounts between 91 days and one year before Universal filed its bankruptcy petition.

The trustee's complaint was subsequently amended to add a third cause of action against both defendants based on a theory of equitable subordination. A motion by the defendants to make the equitable subordination claim more certain was granted, and, in May 1988, the trustee filed a third amended complaint to expand the allegations of such claim. The defendants moved to dismiss the trustee's equitable subordination claim; such motion was granted by order of June 30, 1988, for the reasons set forth in the bankruptcy court's memorandum decision of June 24, 1988. *In re Universal Foundry,* 88 B.R. 891 (Bankr.E.D.Wis.1988).

The adversary proceeding then went to trial on the two remaining claims. At the close of the trustee's evidence, the Bank moved to dismiss all claims against it. That motion was granted without objection from the trustee.

At the conclusion of the trial, the trustee withdrew his claims against FWFC based on the one-year preference period applicable only to insiders of Universal. Thus, the issue at trial was reduced to whether FWFC had received any preferential transfers during the 90 days preceding Universal's bankruptcy.

The transfers at issue related to FWFC's blanket security interest in all of Universal's inventory, receivables, and certain other assets which had been perfected many years before Universal filed its bankruptcy petition. When Universal acquired new inventory or generated new receivables during the 90 days prior to the filing of its chapter 11 bankruptcy petition, FWFC's security inter-

est automatically attached to such assets and became perfected. The trustee argued that such transfers were avoidable under 11 U.S.C. § 547(b) and that FWFC was obligated to return the property transferred (or its value) to the bankruptcy estate.

FWFC's defense at trial was based upon 11 U.S.C. § 547(c)(5) which precludes a trustee from avoiding this particular type of transfer unless the transferee has improved its position to the prejudice of unsecured creditors. In analyzing FWFC's defense, the bankruptcy judge was obligated to determine the amount of Universal's debt to FWFC and the value of FWFC's collateral. After making these calculations, the judge concluded that the transfers by Universal to FWFC, which were made within the 90 day preference period, improved FWFC's collateral position and reduced the amount by which Universal's debt exceeded FWFC's collateral by the sum of $354,575.16. The bankruptcy judge then permitted the trustee to avoid the $354,575.16 improvement in FWFC's collateral position as a preferential transfer under 11 U.S.C. § 547(b) and also awarded prejudgment interest from September 4, 1986, plus costs and statutory attorneys' fees.

On appeal, FWFC challenges the bankruptcy judge's ruling that the transfer in question constituted an avoidable preference on the ground that the bankruptcy judge erred in failing to consider whether the improvement in FWFC's collateral position during the 90 days before Universal's bankruptcy operated "to the prejudice of other creditors holding unsecured claims," as required by 11 U.S.C. § 547(c)(5). In addition, it challenges the bankruptcy judge's calculation that its collateral position was improved by the sum of $354,575.16 on three grounds: (1) the bankruptcy judge erroneously applied a going-concern standard for the valuation of FWFC's collateral; (2) the bankruptcy judge improperly allowed certain sales to be added to Universal's accounts receivable balances without making a corresponding adjustment in the inventory balances on those dates; and (3) the bankruptcy judge erroneously determined that Universal's debt to FWFC did not include interest accruing on certain industrial revenue bonds.

In its cross-appeal, the trustee challenges the bankruptcy court's dismissal of its equitable subordination claim and the rate applied by the bankruptcy court in fixing prejudgment interest.

■ On appeal of a judgment of a bankruptcy court, I am obligated to "affirm, modify, or reverse [the] judgment ... or remand for further proceedings." Bankruptcy Rule 8013. Factual findings of the bankruptcy court are to be reviewed under a clearly erroneous standard, but conclusions of law are to be reviewed de novo. *Matter of Bonnett,* 895 F.2d 1155, 1157 (7th Cir.1989); Bankruptcy Rule 8013.

## II. Preferential Transfer: Prejudice to Unsecured Creditors

■ The Bankruptcy Code has assigned five elements for a preference under 11 U.S.C. § 547(b), all of which must be met in order for the trustee to avoid a transfer. Under the code, a transfer is preferential if (1) it is to a creditor, (2) on account of a pre-existing debt, (3) made while the debtor is insolvent, (4) made on or within 90 days before the date of filing the petition, and (5) enables the creditor to receive more than it would receive if the estate were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 547(b).

■ The parties do not dispute that all five elements were met in this case. Rather, FWFC argues that the exception found within 11 U.S.C. § 547(c)(5) defeats the trustee's attempt to avoid the transfer. Section 547(c)(5) provides:

(c) The trustee may not avoid under this section a transfer—

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt ...

(A)(i) ... 90 days before the date of the filing of the petition;

Section 547(c)(5) of the code protects floating liens in inventory or accounts receivable from attack by the trustee under § 547(b) to the extent that the creditor's position is not improved at the expense of unsecured creditors during the preference period. *See In re Ebbler Furniture and Appliances Inc.*, 804 F.2d 87, 89 (7th Cir.1986) ("Section 547(c)(5) prevents a secured creditor from improving its position at the expense of an unsecured creditor during the 90 days prior to filing the bankruptcy. petition."); *see also* Benjamin Weintraub and Alan N. Resnick, *Bankruptcy Law Manual*, ¶ 7.05[9], at 7–41 (3rd ed. 1992).

In general, application of § 547(c)(5) involves a two-step process:

> [T]he first step ... is to determine the amount of the loan outstanding 90 days prior to filing and the "value" of the collateral on that date. The difference between these figures is then computed. Next, the same determinations are made as of the date of filing the petition. A comparison is made, and, if there is a reduction during the 90 day period of the amount by which the initially existing debt exceeded the security, then a preference for § 547(c)(5) purposes exists.

*In re Ebbler*, 804 F.2d at 89–90.

In the instant action, Chief Judge Clevert performed this two-step process and concluded that FWFC's collateral position had improved during the preference period in the amount of $354,575.16. FWFC argues that it was not necessary for the bankruptcy judge to make the two-step calculation because the unsecured creditors were not prejudiced by the transfers at issue. This is so, FWFC maintains, because the court found that the Bank had a valid security interest in Universal's inventory and receivables which was junior to FWFC's security interest. According to FWFC, in the absence of its transfers, the *Bank's* junior lien would have prevented unsecured creditors from recovering any of the inventory or receivables. FWFC contends that the bankruptcy judge's failure to consider the lack of prejudice to unsecured

creditors caused by its transfers constitutes reversible error.

■ A review of the findings of fact and conclusions of law issued by the bankruptcy judge in his memorandum decision of January 14, 1992, reveals that he did not make a specific finding that unsecured creditors were prejudiced as a result of the transfer to FWFC. Nevertheless, Chief Judge Clevert expressly found that the transfers "improved FWFC's collateral position;" implicit in his determination that the trustee could avoid the transfer under 11 U.S.C. § 547(b) was his conclusion that the unsecured creditors were so prejudiced. *See* 11 U.S.C. § 547(c)(5).

■ FWFC's argument has little cogency upon a consideration of the actual facts of this case. It is undisputed that at all relevant times, FWFC was an undersecured creditor; that is, a creditor whose collateral (here, Universal's inventory and accounts receivable) had a value less than the debt it secured. Under 11 U.S.C. § 506(a), a claim of an undersecured creditor against the debtor's estate is divided into two components: (1) a secured component—which is comprised of the value of the creditor's collateral; and (2) an unsecured component—the remaining balance of the creditor's claim. *Barash v. Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir.1981). Thus, FWFC's claim against Universal's estate was partially secured on the date Universal filed its bankruptcy petition—September 5, 1984—and 90 days prior thereto—June 6, 1984.

■ FWFC correctly notes that the Bank also possessed a valid perfected security interest in Universal's inventory and accounts receivable; however, such security interest was *junior* to FWFC's security interest. It is clear that FWFC was undersecured on June 6, 1984, and on September 5, 1984. Hence, notwithstanding its perfected security interest, the Bank's status on June 6, 1984, and September 5, 1984, with regard to Universal's estate, was that of a completely unsecured creditor. This is so because, at all times, the claim of the senior lienholder— FWFC—exceeded the value of all available collateral. Because the Bank's entire claim was an allowed unsecured claim, its security

interest was of no consequence, irrespective of its validity. *See* 11 U.S.C. § 506(a).

Had the transfer in question not been made to FWFC, the Bank, along with all of the other unsecured creditors (including FWFC to the extent that a component of its claim was unsecured) would have shared pro rata in the $354,575.16 of inventory and accounts receivable upon liquidation. Consequently, I find that the unsecured creditors were prejudiced by the transfer at issue.

FWFC's contention that the Bank's security interest would have prevented the $354,575.16 of inventory and receivables to flow to the unsecured creditors had *it* not received the transfer also ignores the fact that any such transfer to the Bank would have been voidable as a preferential transfer under 11 U.S.C. § 547(b). FWFC argues that the bankruptcy judge's dismissal of the trustee's preference claim against the Bank renders the Bank's security interest immune from the avoidance powers of the trustee under any circumstances. I disagree.

The dismissal of the trustee's preference claim against the Bank was premised on the bankruptcy judge's conclusion that there was no "transfer" to the Bank that could be avoided. Specifically, the dismissal was based on two facts: (1) that FWFC, an undersecured creditor, actually received the transfer due to the build up in inventory and receivables pursuant to its security interest; and (2) that there was no similar "transfer" to the Bank, as the junior lienholder, because the improvement of collateral could not and did not benefit the Bank. (R. 23 at pp. 149–150.) In view of this ruling by the bankruptcy judge, the dismissal of the preference claim does not support the conclusion that a transfer to the Bank pursuant to its security interest in Universal's inventory and receivables within the preference period would not constitute a voidable preference under 11 U.S.C. § 547(b).

Accordingly, I conclude that the unsecured creditors were in fact prejudiced by the transfer of inventory and accounts receivable to FWFC, and that such conclusion is irresistably implicit in the ruling of the bankruptcy court.

### III. Valuation of Collateral

FWFC challenges the method used by the bankruptcy court to determine the value of collateral when performing the two-step calculation required under § 547(c)(5). Here, the bankruptcy court utilized the "book value," or as the court termed it, the "going concern" method in assigning value to the collateral. FWFC contends that the bankruptcy court should have employed the liquidation value of the relevant collateral—accounts receivable and inventory—when assigning a value to the collateral under § 547(c)(5). FWFC maintains that if such approach been used, it would have disclosed that FWFC did *not* improve its position during the preference period.

Under § 547(c)(5), the bankruptcy court is required to compute the "value of all security interests for such debt" as of the date of filing the bankruptcy petition and as of 90 days prior thereto. The definition of "value" under this section was purposefully left without a precise definition. *In re Ebbler*, 804 F.2d at 90. The court of appeals for the seventh circuit has held that value under § 547(c)(5) "should be defined on a case by case basis, with the factual determinations of the bankruptcy court controlling." *In re Ebbler*, 804 F.2d at 91.

As I have previously noted, findings of fact will not be set aside unless clearly erroneous. Bankruptcy Rule 8013. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The clearly erroneous standard does not permit me to reverse the findings of the bankruptcy court simply because I might have decided the case differently. *See F.D.I.C. v. Bierman*, 2 F.3d 1424, 1431 (7th Cir.1993) (citing *Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511).

In the instant action, the bankruptcy court found that the parties themselves were

using a book value method for valuing the security. It also found that the book value was based on Universal's monthly collateral report which included a schedule of all inventory showing the cost and wholesale market value thereof. The bankruptcy court concluded that FWFC relied on these figures as the basis for future lending.

I am unable to rule that the bankruptcy court's factual findings are clearly erroneous so as to warrant reversal. *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985). Based on these factual findings, the bankruptcy court applied the "book value" or, as designated by the court, the "going concern" value of collateral, that was reported to FWFC by Universal as the legal definition of value under § 547(c)(5). Although the bankruptcy court termed the method it used as the "going concern" value, I agree with the trustee that such term was not used in the context criticized in the concurring opinion of Judge Easterbrook in *In re Ebbler,* 804 F.2d at 92; that is, where the value of the *firm* itself is somehow subject to the creditor's security interest along with the firm's goods.

In addition, the record discloses that despite urging the court to utilize the liquidation value method, FWFC offered no evidence as to what the liquidation value of the collateral would have been on June 5, 1984, i.e. 90 days prior to the filing of Universal's petition. Without such evidence, the bankruptcy court would not have been able to make an accurate comparison between the value of the collateral on June 6, 1984, and September 5, 1984, had it used the liquidation value method as suggested by FWFC.

FWFC correctly notes that FWFC applied an 85%–50% formula to the book value of accounts receivable and inventory, respectively, as the basis for determining future lending. However, I am not convinced that the application of such formula, without more, establishes that the parties recognized that the book value of the collateral was not an accurate indicator for evaluating the security. Moreover, FWFC fails to point to any evidence in the record to support its argument that this "discount formula" was indicative of the parties' belief that the book value of the inventory and receivables was simply a starting point for determining the value of the collateral.

In view of the above, I affirm the bankruptcy court's decision to define value as the "going concern" value reported to FWFC by Universal.

## IV. Determination of Book Value of Collateral

FWFC argues that even if the going concern method or "book value" was the proper standard for defining value under § 547(c)(5), the bankruptcy court erred in finding that the collateral balance had a book value of $4,585,968.99 on June 6, 1984, and $5,125,-745.95 on September 4, 1984. (Finding of Fact at ¶ 48.) FWFC finds fault with the fact that the bankruptcy court accepted the calculations of the trustee's expert as to the book value of inventory and accounts receivable over those of its expert.

Based on the value that it assigned to the collateral on the relevant dates, the bankruptcy court concluded that FWFC improved its collateral position during the preference period by the sum of $354,575.16. (Conclusions of Law at ¶ 7.) FWFC contends that had the bankruptcy court accepted its expert's calculations as to the book value of inventory and accounts receivable, it would have concluded that FWFC had improved its position by $91,458—a difference of $263,-117.16.

Once the bankruptcy court concluded that "value" under § 547(c)(5) meant the book value of the collateral as reflected in FWFC's records, it was required to determine the book value assigned to the inventory and accounts receivable as of June 6, 1984, and September 5, 1984. The determination of the book value of FWFC's collateral as of June 6, 1984, and September 5, 1984, is a finding of fact which should not be set aside on appeal unless clearly erroneous. Where there are two permissible views of the evidence, the bankruptcy court's choice between the two of them cannot be labeled clearly erroneous. *See Bierman,* 2 F.3d at 1431, (citing *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511).

To assist the bankruptcy court in computing the book value of the collateral on the relevant dates, the parties offered the testimony of experts. For purposes of their respective calculations, both experts utilized FWFC's records which adjusted the book value of Universal's collateral at the end of each month. Because such records were adjusted only on a monthly basis, both sides' experts acknowledged that in order to determine the book value of inventory and accounts receivable on June 6, 1984, one was required to start with the May 31, 1984, figures ($2,067,000 and $2,076,945.25 respectively) and adjust them for any activity that occurred during the June "gap period" (June 1, 1984, through June 5, 1984). Similarly, in order to determine the book value of inventory and accounts receivable on September 5, 1984, it was necessary to begin with the August 31, 1984, figures ($2,455,000 and $1,709,506.41 respectively) and adjust them for any activity that occurred during the September "gap period" (September 1, 1984, through September 4, 1984). Further, both experts recognized (at least theoretically) that the adjustment process included three steps: (1) increasing the accounts receivable by the amount of sales made during the gap periods; (2) reducing the inventory for cost of the sales made during the gap periods; and (3) increasing the inventory by new purchases and the value of labor added during the gap periods.

The trustee's expert, Elmer Huepel, testified that the collateral balance as of June 6, 1984, was $4,585.968.44 and as of September 5, 1984, was $5,125,745.95. When FWFC's expert, Joseph Hinkel, applied the above three steps, he determined that the collateral balance as of June 6, 1984, was $4,527,586.11 and as of September 5, 1984, was $4,804,245.37.

Mr. Huepel computed the book value of the collateral by adding the sales made during the gap periods to the account receivable balances for May 31, 1984, and August 31, 1984, as required in step one. These figures were derived from Universal's ledger. (R. Plaintiff's Ex. 3.) Mr. Huepel then purposefully omitted steps two and three from the computation. According to Mr. Huepel, the dynamic nature of inventory and the lack of any recorded figures corresponding to these steps rendered the adjustments under steps two and three inappropriate.

Specifically, he testified that if he reduced the inventory on account of the cost of the sales which were added to the accounts receivable as specified under step two, it was then necessary to increase the inventory balances to account for new manufacturing activity during the gap periods under step three. Yet, he opined that it was improper to make the increase for manufacturing activity called for under step three without any recorded figures identifying the actual activity during the gap periods because it was impossible to determine that activity to any degree of certainty. This was so, he stated, because those figures changed on a minute-by-minute basis. (R. 23 at 110–12.)

It was Mr. Huepel's conclusion that, under the circumstances, the most reliable basis for measuring the inventory on the pertinent dates was the book value of inventory as of May 31, 1984, and August 31, 1984, without the adjustments contemplated in steps two and three. (R. 23 at 111–12.) Mr. Huepel also testified that eliminating the adjustments specified under steps two and three was consistent with the parties' decision to adjust the inventory numbers on a monthly basis and not on a daily basis. (R. 23 at 111.)

Notwithstanding the absence of any recorded figures corresponding to steps two and three, FWFC's expert opted to perform all three steps of the calculation. In performing the calculation, Mr. Hinkel elected to estimate the figures required under steps two and three. He estimated that Universal's cost of sales during the gap period was 98%. Therefore, he reduced the inventory balances under step two by 98% of the gap period sales. In addition, he estimated that $9,000 was attributable to manufacturing activity during the September "gap period" but concluded that this de minimis increase did not demand an actual adjustment under step three.

The bankruptcy court was thus faced with two conflicting assessments of the book value of the collateral. One, that of the trustee's expert, was based on the available recorded

figures, and the other, that of FWFC's expert, on an estimate which was derived, in part, from Universal's recorded figures. The court chose to accept the testimony of the trustee's expert. I find the testimony of the trustee's expert to be supported by the evidence; thus, I do not have a definite and firm conviction that the bankruptcy court's finding that the book value of the collateral on June 6, 1984, was $4,585,968.99 and $5,125,145.63 on September 5, 1984, is erroneous. *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511.

### V. Calculation of Universal's Debt to FWFC

In addition to calculating collateral values, the mathematical test set forth in § 547(c)(5) required the bankruptcy court to determine the amount of Universal's debt owed to FWFC on the date of bankruptcy and at the beginning of the preference period. FWFC maintains that the bankruptcy court erred in finding that interest on certain industrial revenue bonds [the "bonds"] accruing after December 1, 1992, was a debt owed to the Bank rather than to FWFC.

█ It is undisputed that whether the interest on the bonds at issue was part of Universal's debt to FWFC is a finding of fact. Unless it is clearly erroneous, I should affirm the bankruptcy judge's finding that Universal's debt to FWFC did not include the bond interest accruing after December 1, 1992. Bankruptcy Rule 8013.

█ It was uncontested at trial that, at least initially, the Bank was the owner of the principal and interest on the bonds. The trustee maintained that at all times the Bank was the holder of the bond principal and interest accruing after December 1, 1982. However, FWFC argued at trial that Universal was indebted to it for all of the bond interest because it had purchased Universal's obligation to pay the interest on the bonds from the Bank prior to December 1, 1982.

FWFC offered the testimony of Bruce Sprenger, a loan officer at FWFC, in an attempt to establish that the restructuring of Universal's debt to the Bank and FWFC, as set forth in the 1982 "Receivables and Inventory Loan and Security Agreement" [the

"loan agreement"], demonstrated that FWFC had purchased a number of Universal's debts from the Bank. According to FWFC, these purchased obligations were defined under the loan agreement as "unpaid interest." Mr. Sprenger testified that such "unpaid interest" included interest that had accrued on the bonds as of November 30, 1982, and all interest accruing on the bonds after December 1, 1982. (R. 24 at 48–51.)

A review of the loan agreement reveals that it did require Universal to pay "unpaid interest" to FWFC. "Unpaid interest," as defined under the loan agreement, encompasses bond interest due the Bank as of November 30, 1982, "and all further interest . . . accruing from the date of [the] Agreement [December 1, 1982] through September 30, 1984." (R. 29 at 6.) Nevertheless, the loan agreement does not provide that *ownership* of the right to bond interest accruing after December 1, 1982, was transferred from the Bank to FWFC. Further, the loan agreement itself can not be said to have transferred ownership of the bond interest to FWFC because the Bank was not a party to that agreement.

FWFC maintains that in addition to Mr. Sprenger's interpretation of the loan agreement, there was objective evidence demonstrating that it had purchased the bond interest debt from Universal. I do not believe that FWFC's creation of sub-accounts to record the unpaid interest on the bonds accruing after December 1, 1982, is itself determinative of FWFC's *ownership* of the bond interest; nor is the existence of these sub-accounts inconsistent with the theory advanced by the trustee that FWFC was merely a collecting agent for the Bank. Moreover, I do not agree with FWFC that the letter of January 10, 1984, from FWFC acknowledging Universal's obligation to pay FWFC "unpaid interest" and fees of $2,359,-763 is proof of a sale of Universal's bond interest obligation by the Bank to FWFC. Thus, the record is devoid of any documentation evidencing the Bank's sale of Universal's obligation to pay bond interest accruing after December 1, 1982.

In contrast, there was testimony *and* documentary evidence to support the trustee's

position that FWFC had not purchased the right to future bond interest from the Bank. For instance, Mr. Sprenger himself conceded that the loan agreement does not obligate FWFC to buy or the Bank to sell the bond interest. (R. 26 at 34–35.)

That FWFC had not purchased the bond interest debt from the Bank is further supported by a letter of December 1, 1982, from Roger Engelking, a vice-president of the Bank, to Universal. In this letter, Mr. Engelking summarized the changes effected by the loan agreement between FWFC and Universal. He explained that under the loan agreement, "accrued interest on both notes and compensating balances will continue to be due and owing to us [the Bank], although they will be *payable* to the Corporation [FWFC] *as our agent....* The accrued and unpaid interest on the Bonds will be *payable* to the Corporation *as our agent* in accordance with the Loan Agreement...." (R. 29 at 15.) (Emphasis added.)

Furthermore, a second letter from Mr. Engelking to Universal, dated December 23, 1982, informed Universal that the Bank "as holder of 100% of the Bonds agreed, subject to Universal's approval, that the payment of interest on the principal amount of the ... Bonds ... accrued and unpaid ... from the respective dates of issue of the ... Bonds through December 31, 1984, shall be deferred to December 31, 1984...." (R. 30 at 6.) The record discloses that Universal approved of this arrangement. (R. 30 at 6.) The fact that a deferment of the payment of the interest on the bonds was made between the *Bank* and Universal conflicts with FWFC's unsubstantiated theory that it had purchased the bond interest obligation from the Bank prior to December 1, 1982.

FWFC also argues that the trustee should be estopped from claiming that a portion of the debt under the loan agreement was independently owed to the Bank because the trustee did not object to the proof of claim filed by FWFC which claimed all of the debt under the loan agreement including all of the bond interest debt. However, the record reveals that FWFC did not raise such argument before the bankruptcy court; thus, FWFC has waived its estoppel argument and

is precluded from presenting it for the first time on appeal. *In the Matter of Kroner,* 953 F.2d 317, 319 (7th Cir.1992). FWFC has not articulated any exceptional circumstances warranting deviation from this well-established rule of appellate review. *Kroner,* 953 F.2d at 319.

Based on the documentary evidence which substantiated the trustee's theory in comparison with the unsubstantiated testimony of Mr. Sprenger, I must support the bankruptcy judge's finding that Universal's debt to FWFC did not include the bond interest accruing after December 1, 1982.

## VI. *Dismissal of Trustee's Equitable Subordination Claim*

The trustee's equitable subordination claim was originally articulated in his second amended complaint. In response, the defendants' filed a motion to dismiss the equitable subordination claim under Rules 12(b)(6) and 9(b), Federal Rules of Civil Procedure and Bankruptcy Rules 7012(b) and 7009 and, in the alternative, for a more definite statement under Rule 12(e), Federal Rules of Civil Procedure and Bankruptcy Rule 7012(b). By decision and order of May 2, 1988, the bankruptcy court denied the defendants' motion to dismiss but granted their motion for a more definite statement.

In response, the trustee filed a third amended complaint and alleged the following with respect to the equitable subordination claim:

17. The allegations of paragraphs 11, 12 and 13 are incorporated by reference here.

18. This cause of action arises under 11 U.S.C. § 510(c).

19. Continuously from some time in 1982 to the date of the original petition herein was filed, the defendants, separately and acting in concert or as agents for one another, engaged in inequitable conduct. This conduct included (a) providing false and misleading information and failed [stet] to provide correct material information to suppliers of goods and services which resulted in the improvident extension of credit and services and which en-

hanced the position of the defendants at the expense of the creditors; and (b) breaking repeated promises to finance the debtor's operations upon which other creditors and the employees of the debtor relied to their detriment.

20. Upon information and belief, the false and misleading information was disseminated by the defendants to and the material omissions referred to in the preceding paragraph were withheld from substantially all suppliers of goods, materials and services to Universal beginning some time before September 30, 1982 and continuously thereafter until the filing of Universal's Chapter 11 petition. The false and misleading information and material omissions included, without being limited to, the following:

(a) Representing that Universal maintained substantially higher deposit balances at the First Wisconsin than it actually maintained;

(b) Substantially understating the size of Universal's outstanding loans from the defendants;

(c) Stating that such loans were secured when in fact they were substantially undersecured and in some respects unsecured;

(d) Representing that the loans were guaranteed, without disclosing that the guarantee was by Universal's parent company, the only asset of which was the stock of Universal itself, so that the guarantee offered no additional security;

(e) Failing to disclose that from at least some time in 1982 and continuously thereafter Universal was insolvent; and

(f) Manipulating the financial affairs of the corporation, including selective payments to certain creditors, to create the false appearance of solvency.

The dissemination of the foregoing false and misleading information and the material omissions were continuous and pervasive on the part of the defendants from sometime in 1981 until Universal's Chapter 11 petition was filed.

21. In late 1981 and into mid 1982 the Bank induced the management of Universal to obtain wage concessions form the company's union employees, whereby 10% of wages would be deferred at 12% interest. Management obtained this concession based upon assurances by the Bank that it would not allow Universal to go into bankruptcy. Based on this the union also abandoned its insistence that wage claims have a higher priority than those of the Bank in the event of bankruptcy. Both the union and Universal relied upon these assurances by the Bank to their detriment. Further, based upon the repeated representations by the Bank similar to those referenced to earlier in this paragraph, the Bank obtained an additional 16% wage give-up by Universal employees in late 1982.

22. The defendants exercised domination over and control of the debtor. They were insiders and fiduciaries as to the debtor and its creditors.

23. Equitable subordination of the defendants' claims would not be inconsistent with the provisions and purposes of the Bankruptcy Act.

After the trustee filed his third amended complaint, the defendants renewed their motion to dismiss under Rules 12(b)(6) and 9(b), Federal Rules of Civil Procedure and, in the alternative, for a more definite statement under Rule 12(e), Federal Rules of Civil Procedure. By decision and order of June 24, 1988, the bankruptcy court held that the complaint was deficient under Rule 9(b), Federal Rules of Civil Procedure and granted the defendants' motion to dismiss the trustee's equitable subordination claim. In addition, the bankruptcy court denied the trustee further leave to amend the complaint.

■■■ Whether the allegations of the trustee's equitable subordination claim were deficient under Rule 9(b), Federal Rules of Civil Procedure, is a conclusion of law which I will review de novo. Rule 9(b), Federal Rules of Civil Procedure requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

As interpreted by the court of appeals for the seventh circuit, Rule 9(b) obligates the plaintiff to state in his complaint "the identi-

ty of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated...." *Bankers Trust Co. v. Old Republic Insurance Co.*, 959 F.2d 677, 683 (7th Cir.1992) (quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). Complaints charging fraud must also sufficiently allege the defendant's fraudulent intent. *Graue Mill Development Corp. v. Colonial Bank & Trust Company of Chicago,* 927 F.2d 988, 992 (7th Cir.1991). "Mere ... averments to conditions of mind, or references to plans and schemes are too conclusional to satisfy the particularity requirements" under Rule 9(b). *Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989) (quoting *Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985)). Instead, the complaint must state the "specific content of the false representation" and "the identities of the parties to the misrepresentation." *Graue Mill Development,* 927 F.2d at 993 (quoting *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989)).

■ I am persuaded that the trustee's third amended complaint did not satisfy the requirements of Rule 9(b), Federal Rules of Civil Procedure. The third amended complaint failed to allege to whom the avowed misrepresentations and material omissions were made. The trustee alleged that the false and misleading information was transmitted to and the material omissions withheld from "substantially all suppliers of goods, materials and services to Universal." Such identification is hardly specific. Universal has many suppliers of goods, materials and services. The defendants cannot reasonably defend themselves against allegations of misrepresentation where the plaintiff does not specify which of its many suppliers received the misrepresentations or information containing material omissions. The trustee's failure to identify the persons who allegedly received the misinformation from the defendants with any degree of particularity is especially egregious because the trustee was previously given an opportunity to provide a more detailed identification of such persons but failed to do so.

Furthermore, the allegations of the complaint do not identify the persons or agents employed by the defendants who are responsible for the alleged misrepresentations or material omissions. It is insufficient, especially where, as here, the plaintiff has engaged in some discovery prior to filing the complaint, to attribute misrepresentations to a corporate entity without naming the responsible individuals. *See Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2nd Cir.1982) (allegation of fraud which failed to state persons responsible for corporation's alleged improper advice is inadequate under Rule 9(b)).

The complaint also failed to allege the defendants' fraudulent intent. *Graue Mill Development Corp.,* 927 F.2d at 992. Another deficiency in the complaint relates to the allegations of misrepresentation which were made "on information and belief." This is an improper factual basis on which to make such allegations under Rule 9(b). *See Bankers Trust Co.,* 959 F.2d at 683–684 ("duty to plead the circumstances constituting fraud with particularity could not be fulfilled by pleading those circumstances on 'information and belief' unless they were facts inaccessible to the plaintiff, in which event he had to plead the grounds for his suspicions") (citing *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 932 (7th Cir.1989) (en banc)). The plaintiff advances the lame argument that the factual basis for his pleadings was sufficient because the defendants know the details of their own alleged wrongdoing and have ready access to the names of the individuals who received the misinformation; however, the trustee does not allege that these facts were inaccessible to him or within the defendants' *exclusive* control. In the absence of such allegations, the plaintiff was not relieved of its obligation to provide a factual basis for its belief that the defendants were engaged in fraudulent activity.

In addition, the complaint did not identify the method by which the misrepresentations were allegedly communicated by the defendants. That is, the plaintiff did not indicate whether the alleged misrepresentations were communicated orally or in writing. This omission does not comport with the plaintiff's

obligation to describe the "bare bones" of the alleged fraudulent scheme. *See Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975) (averments which describe the "bare bones" of a fraudulent scheme survived Rule 9(b) challenge to complaint), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990).

Based on these numerous deficiencies, I agree with the bankruptcy court's conclusion that the trustee did not adequately plead the circumstances constituting fraud in connection with its equitable subordination claim as required under Rule 9(b), Federal Rules of Civil Procedure.

▪ The trustee also argues that the dismissal of his entire equitable subordination claim under Rule 9(b), was erroneous insofar as a portion of the claim was based upon "broken promises of financing" as opposed to fraud. A review of the record, including the trustee's "Memorandum in Opposition to Defendants' Motion to Dismiss or for a More Definite Statement" reveals that the trustee failed to raise this argument before the bankruptcy court. Indeed, the trustee conceded in his brief opposing the motion to dismiss that the nature of the inequitable conduct underlying the equitable subordination claim was that of "fraud." (Appellant's Reply Brief and Responsive Brief on Cross–Appeal, Ex. A at 1.) The trustee did not argue that the equitable subordination claim should survive to the extent that it involved conduct other than fraud. Because the bankruptcy court did not have the opportunity to consider the argument now advanced by the trustee, such argument will not be considered on appeal. *Kroner,* 953 F.2d at 319.

Accordingly, I find that the bankruptcy court did not err in dismissing the plaintiff's equitable subordination claim under Rule 9(b), Federal Rules of Civil Procedure.

▪ I also affirm the bankruptcy court's decision denying the plaintiff leave to amend his complaint for a fourth time. Bankruptcy Rule 7015 makes Rule 15, Federal Rules of Civil Procedure applicable in adversary proceedings. Under Rule 15(a), leave to amend the complaint shall be "freely given when justice so requires." The deci-

sion to allow a plaintiff to amend his pleading is committed to the sound discretion of the court. *Jones v. Hamelman,* 869 F.2d 1023, 1026 (7th Cir.1989). The appropriate standard of review is abuse of discretion. *In re American Reserve Corp.,* 841 F.2d 159, 162 (7th Cir.1987). It is undisputed that the plaintiff was previously notified by the bankruptcy court that his complaint was deficient under Rule 9(b), Federal Rules of Civil Procedure, with respect to the equitable subordination claim before he filed his third amended complaint. Notwithstanding this notification, the plaintiff failed to overcome the inadequacies of his complaint. In addition, the plaintiff conceded that he had engaged in partial, if not complete, discovery prior to filing his third amended complaint. Allowing the plaintiff to file a fourth amendment would also have caused undue delay in an adversary proceeding that was already almost two years old.

I believe that such circumstances justify denying the plaintiff leave to amend his complaint for a fourth time. *See Denny v. Barber,* 576 F.2d 465, 471 (2nd Cir.1978) (dismissal without leave to amend affirmed where plaintiff failed to cure deficiencies of pleading under Rule 9(b) in first amended complaint despite being apprised of the deficiencies by the court); *Sweeney Company of Maryland v. Engineers–Constructors, Inc.,* 109 F.R.D. 358, 361 (E.D.Va.1986) (plaintiff denied leave to file second amended complaint where first amended complaint did not correct the lack of particularity of original pleading and further amendment would have caused undue delay).

### VII. Pre–Judgment Interest

▪ The trustee maintains that the bankruptcy court erred in awarding prejudgment interest at the rate specified in 28 U.S.C. § 1961 rather that at the prime rate. Insofar as the decision of the bankruptcy court to award prejudgment interest at the rate specified under 28 U.S.C. § 1961 involved the exercise of discretion, the appropriate standard of review is abuse of discretion. *In re American Reserve Corp.,* 841 F.2d at 162; *In re Investment Bankers, Inc.,* 4 F.3d 1556 (10th Cir.1993) (bankruptcy court's award of

prejudgment interest reviewed for abuse of discretion). *See also Gorenstein Enterprises v. Quality Care–USA, Inc.,* 874 F.2d 431, 439 (7th Cir.1989) (Ripple, J., concurring) (citing *Myron v. Chicoine,* 678 F.2d 727, 734 (7th Cir.1982).

The trustee argues that the bankruptcy court's decision to apply the rate set forth in 28 U.S.C. § 1961 was an abuse of discretion because it is counter to the recommendation of the court of appeals for the seventh circuit in *Gorenstein.* In *Gorenstein,* the court of appeals "suggest[ed]" that district judges "use the prime rate for fixing prejudgment interest where there is no statutory interest rate." *Gorenstein,* 874 F.2d at 436. According to the court of appeals, the prime rate is preferable in order to "compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Gorenstein,* 874 F.2d at 436.

That the use of the prime rate in fixing prejudgment interest was not intended as a "rigid litmus test," *Gorenstein,* 874 F.2d at 439 (Ripple, J., concurring), is evident from the majority's insistence that "[they did] not want to straightjacket the district judges...." Thus, the court of appeals did not remove the determination of the appropriate interest rate from a trial judge's discretion; it merely set forth a useful guideline for the purpose of "convenience." *Gorenstein,* 874 F.2d at 437.

■ The bankruptcy court concluded that, in the absence of a statutory interest rate, the suitable rate to be applied in the case at hand was the coupon-yield rate set forth in 28 U.S.C. § 1961 which fixes the *postjudgment* interest rate for federal cases. The court concluded that the coupon-yield rate was proper under the circumstances because, unlike the situation in *Gorenstein,* the risk of default in this case was low as FWFC is part of a highly solvent, multistate holding company. Moreover, the bankruptcy court reasoned that equity required the application of the rate under 28 U.S.C. § 1961 as opposed to the higher prime rate because the trustee did not request prejudgment interest at all in his original complaint or in any of his three amended complaints. The bankruptcy court also found that the trustee had failed to

demonstrate how equity would be served by applying the prime rate.

In support of the bankruptcy court's decision, I note that, since *Gorenstein,* at least one other bankruptcy court in the seventh circuit which has twice addressed the issue of awarding prejudgment interest in preference actions declined to award prejudgment interest at the prime rate and instead utilized the coupon-yield rate of 28 U.S.C. § 1961. *See In re Helen Gallagher Enterprises, Inc.,* 126 B.R. 997 (Bankr.C.D.Ill.1991) (Altenberger, J.); *In re Industrial & Municipal Engineering, Inc.,* 127 B.R. 848, 851 (Bankr.C.D.Ill. 1990) (Altenberger, J.).

Contrary to the trustee's contention, I do not believe that the bankruptcy court's decision to apply the rate of 28 U.S.C. § 1961 in fixing prejudgment interest conflicts with the holding in *Gorenstein.* The bankruptcy court, consistent with the guidelines in *Gorenstein,* considered which interest rate would best compensate the plaintiff for loss of the use of its money and risk of default. The bankruptcy court's findings that the risk of default was low or non-existent and that the trustee had failed to make its own request for prejudgment interest at any rate are not clearly erroneous. In my opinion, a reasonable person could indeed agree with the bankruptcy court's conclusion that the circumstances of this case warranted application of the coupon-yield rate rather than the prime rate.

## VIII. Costs

■ The trustee requests that the court award "fees and costs on this appeal." Bankruptcy Rule 8014 provides that, "Except as otherwise ... ordered by the district court ..., costs shall be taxed against the losing party on an appeal." Because I will affirm the judgment of the bankruptcy court in its entirety, the interlocutory order of June 24, 1988, and the order of October 13, 1992, FWFC is the losing party in connection with its appeal, and the trustee is the losing party in connection with his cross-appeal. Under the circumstances, the better exercise of discretion is to let each party bear its own costs on this appeal and cross-appeal.

To the extent that the trustee's request for "fees" seeks attorneys' fees, such demand will also be denied. Rule 8014 does not grant the trustee a right to an award of attorneys' fees, and the trustee has not provided the court with any other basis for such an award.

Therefore, IT IS ORDERED that the judgment of the bankruptcy court be and hereby is affirmed.

IT IS ALSO ORDERED that the bankruptcy court's interlocutory order of June 24, 1988, dismissing the trustee's equitable subordination claim be and hereby is affirmed.

IT IS FURTHER ORDERED that the bankruptcy court's order of October 13, 1992, be and hereby is affirmed.

IT IS FURTHER ORDERED that pursuant to Bankruptcy Rule 8014, each party will bear its own costs in connection with the instant appeal and cross-appeal.