722 F.2d 1
 Fed. Sec. L. Rep. P 99,569
DATA PROBE ACQUISITION CORP. and Data Probe, Inc.,
Plaintiffs-Appellees,
v.
DATATAB, INC., Sanford C. Adams, Lee D. Gallaher, John L.
Lobel, CRC Information Systems, Inc., and CRC
Acquisition Corp., Defendants-Appellants.
 No. 267, Docket 83-7639.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 2, 1983.
Decided Nov. 22, 1983.
 
 Edward Labaton, New York City (Stuart D. Wechsler, Joel C. Feffer, Lawrence A. Sucharow, John H. Riley, Kass, Goodkind, Wechsler & Labaton, New York City, on brief), for plaintiffs-appellees.
 Francis E. Lake, Jr., New York City (Allen G. Burgoyne, Putney, Twombley, Hall & Hirson, New York City, on brief), for defendants-appellants.
 Before KEARSE, CARDAMONE and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Plaintiffs Data Probe, Inc. and its wholly owned subsidiary Data Probe Acquisition Corp. (collectively "Data Probe") brought this action to enjoin the merger of defendants CRC Acquisition Corp., a wholly owned subsidiary of defendant CRC Information Systems, Inc. (collectively "CRC"), and Datatab, Inc. ("Datatab"). CRC and Datatab had entered into an Agreement and Plan of Merger (the "Merger Agreement") under which Datatab would become a wholly owned subsidiary of CRC. In its complaint, Data Probe, which itself was attempting to gain control of Datatab through a tender offer, alleged that Datatab and CRC had committed various violations of federal securities laws and regulations. After an expedited trial, the district court, 568 F.Supp. 1538, found that an option to purchase Datatab stock acquired by CRC was a "manipulative" device proscribed by Section 14(e) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. Sec. 78n(e) (1976). It also found that a letter written by Datatab to its shareholders failed to satisfy the disclosure requirements established by Section 14(e) of the Act and by Securities and Exchange Commission ("SEC") Rule 14e-2, 17 C.F.R. Sec. 240.14e-2 (1983). For these two reasons the district court enjoined exercise of the option by CRC, thus preventing the merger as well. This expedited appeal followed.
 
 
 2
 We reverse on both grounds.
 
 BACKGROUND
 
 3
 In December, 1982, the management of Datatab, a publicly traded New York corporation engaged in the market research business, approached the management of CRC, a privately held New York corporation in the same field, to discuss the possibility of CRC's acquiring Datatab. The decision to approach CRC was prompted by the deteriorating financial condition of Datatab, which had been experiencing mounting losses. Negotiations ensued, and on April 29, 1983, the two companies announced the Merger Agreement, which provided that a wholly owned CRC subsidiary would be merged into Datatab and that holders of Datatab common stock would then receive $1.00 per share in cash, leaving Datatab a wholly owned subsidiary of CRC.
 
 
 4
 Applicable New York law required the approval of two-thirds of Datatab's shareholders and Datatab's Board scheduled a special meeting of shareholders to be held on June 23, 1983. On May 26, proxy materials announcing the meeting and describing the merger were sent to Datatab shareholders. Among the conditions of the merger described in the proxy materials was an undertaking by CRC to enter into employment agreements with Sanford Adams, Lee Gallaher and John Lobel, who were officers of Datatab or a subsidiary and who comprised Datatab's Board of Directors. Each was to receive a three-year contract. It is undisputed that the proxy materials, including the disclosure of the employment agreements, conformed to the requirements of applicable state and federal law.
 
 
 5
 On June 21, 1983, two days before the shareholders' meeting, Data Probe, a New York corporation also engaged in the market research business, announced a cash tender offer for any and all shares of Datatab stock at $1.25 per share. The offer, which was apparently not discussed with the management of Datatab or CRC, was contingent on the failure of Datatab shareholders to approve the proposed merger between Datatab and CRC. Its announcement caused Datatab's Board to adjourn the special shareholders' meeting.
 
 
 6
 On the evening of June 21, Yitzhak Bachana, president and majority shareholder of Data Probe, met over dinner with Sanford Adams of Datatab to discuss Data Probe's interest in Datatab.[1] The two men took up the subject of the future of current Datatab employees in the event Data Probe's tender offer was successful. Adams's notes from the meeting indicate that Bachana thought that discussion of the employment contracts of Adams, Lobel, and Gallaher was "premature." Bachana testified at the hearing that he indicated to Adams that "he could not make any promises" with respect to the future of current Datatab management.
 
 
 7
 Further negotiations between Datatab and CRC were held and, on July 1, the two firms concluded a revised merger agreement (the "July 1 Agreement") under which Datatab shareholders would receive $1.40 per share. As a part of the July 1 Agreement, Datatab granted CRC a one-year irrevocable option to purchase 1,407,674 authorized but unissued Datatab shares at $1.40 per share. Since Datatab had only 703,836 shares of common stock outstanding, the practical effect was to guarantee that CRC could acquire Datatab by exercising the option, no matter how many of the outstanding shares were tendered to Data Probe. It could then vote its resulting two-thirds interest in Datatab for the merger with its subsidiary.
 
 
 8
 In a letter to its shareholders also dated July 1 (the "July 1 shareholders' letter") the Datatab Board announced its response to the still outstanding Data Probe tender offer. The letter was sent to conform with the duty imposed by SEC Rule 14e-2, 17 C.F.R. Sec. 240.14e-2 (1983), which requires that within ten business days of the making of a tender offer the subject company must inform its shareholders of its position with respect to the offer and of the reasons supporting its position. The letter advised that "[i]n view of the new $1.40 per share merger offer from CRC, the Board recommends that [shareholders] not tender ... shares for the $1.25 price ... offered by Data Probe." (Emphasis in the original). The letter described the CRC option to purchase Datatab shares, but it drew no explicit connection between the grant of the option and the likely outcome of the struggle for control of Datatab.
 
 
 9
 On July 14, Data Probe increased its offer to $1.55 per share, conditioned upon termination of the CRC option or a judicial determination of the option's invalidity. At the same time it commenced this action by filing a complaint that alleged, among other things, that the option was a "manipulative act or practice" committed in connection with a tender offer in violation of Section 14(e) of the Act. The complaint alleged no violations of state law. The relief sought was, inter alia, an injunction barring exercise of the option.
 
 
 10
 After a hearing, Judge Sofaer announced his findings and conclusions and rendered final judgment in favor of plaintiff Data Probe. He held that Section 14(e), by forbidding "manipulative ... practices in connection with any tender offer," proscribed acts that "unduly obstruct the exercise of informed shareholder choice." Because CRC's option to purchase the unissued Datatab shares effectively nullified Data Probe's tender offer, Judge Sofaer concluded that the option was proscribed by Section 14(e). He also found that the July 1 shareholders' letter was materially misleading in that it did not state as a reason for the Board's position the fact that, unlike Data Probe, CRC had guaranteed employment to Adams, Lobel and Gallaher, and in that it drew no connection between the grant of the option and the outcome of the contest for control of Datatab. Judge Sofaer enjoined exercise of the option.
 
 
 11
 Following the district court's decision Data Probe went forward with its $1.55 per share tender offer. As of August 9, 1983, more than 60 percent of Datatab's outstanding stock had been tendered to Data Probe.
 
 
 12
 This appeal, also expedited, followed.
 
 DISCUSSION
 1. Manipulative Devices Under Section 14(e)
 
 13
 Congress added Section 14(e) to the Act in 1968 by passing the Williams Act, Pub.L. No. 90-439, 82 Stat. 454 (codified at 15 U.S.C. Secs. 78m(d)-(e), 78n(d)(f) (1976)). Section 14(e) provides in pertinent part that "[i]t shall be unlawful for any person ... to engage in any fraudulent, deceptive, or manipulative acts or practices ... in connection with any tender offer."[2] Relying exclusively on this language for authority and assuming the option's validity under the New York State Corporation Law, the district court held the CRC option invalid. Since we must also assume the option's validity under state law, the question presented on appeal is whether Section 14(e) authorizes federal courts to review the substantive validity of corporate actions undertaken during the course of a tender offer. We conclude that it does not.
 
 
 14
 Viewing the CRC option solely as a self-serving barrier created by Datatab's management to prevent its shareholders from choosing the Data Probe offer, the gravamen of the wrong alleged is a breach of fiduciary duty which we are not free to condemn under existing federal legislation. In Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court explicitly refused to extend the prohibition against "manipulative ... devices," SEC Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1983), to "instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." Id. at 477, 97 S.Ct. at 1302. The Court construed the term "manipulative" in a "technical sense of artificially affecting market activity in order to mislead investors." 430 U.S. at 476, 97 S.Ct. at 1302. We have held this construction applicable to Section 14(e). Billard v. Rockwell Intern. Corp., 683 F.2d 51, 56 (2d Cir.1982). A complaint which alleges only that management has for self-serving reasons acted so as to deprive shareholders of a favorable financial opportunity does not state a valid claim under Section 14(e), therefor. Billard explicitly held that the fairness or unfairness to shareholders of a transaction engaged in by a control group is irrelevant under Section 14(e), id. at 55, even where that transaction prevents shareholders from an opportunity to sell their shares at a higher price to a "White Knight." Misrepresentation is thus an essential element of a cause of an action under Section 14(e). Lewis v. McGraw, 619 F.2d 192, 195 (2d Cir.), cert. denied, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980).
 
 
 15
 In Santa Fe, the Supreme Court also stated that "[a]bsent a clear indication of congressional intent," it was "reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." Id. 430 U.S. at 479, 97 S.Ct. at 1304. The gravamen of the claim advanced here is a breach of management's fiduciary duty to shareholders, a matter traditionally committed to state law, which, if entertained, would unquestionably embark us on a course leading to a federal common law of fiduciary obligations. We decline to embark on such a course under Section 14(e).
 
 
 16
 In Edgar v. Mite Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), a majority of the Court held that the Illinois Takeover Act imposed an impermissible burden on interstate commerce, a rationale inapplicable to the present dispute which involves private acts. A plurality of the Court found that the statute was preempted by the Williams Act on at least three grounds: (1) the Illinois statute required that an offeror inform both the Secretary of State and the target of its intentions twenty business days before the offer; (2) tender offerors were forbidden to proceed until after a hearing before the Secretary of State; and (3) the Secretary could block an offer if he or she found its terms unfair. Id. 102 S.Ct. at 2637-40. Our decision is consistent with the plurality opinion in Mite, written by Justice White, the author of Santa Fe. The Mite plurality addresses the extent to which states may regulate the process of tender offers through timing requirements, mandatory hearings on fairness, and the like in light of the provisions of the Williams Act. Language in the plurality opinion suggesting that neither management nor bidders should have an "unfair advantage," 102 S.Ct. at 2636, means that states may not seek to provide such an advantage through legislative regulation of the tender offer process, including administrative review of the fairness or unfairness of the offer. States are forbidden to impose such burdens on the process, not because the Williams Act imposes similar burdens, but because it was intended to be the outer limit of the positive regulatory role of government.[3]
 
 
 17
 We disagree, therefore, with Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.1981) to the extent that Marathon creates judge made substantive obligations imposed upon offerors or the management of offerees engaged in a tender offer contest and repeat our conviction that it is "an unwarranted extension of the Williams Act." Buffalo Forge Co. v. Ogden Corp., 717 F.2d 757 at 760, slip op. at 6662 (2d Cir.1983).
 
 2. Disclosure
 
 18
 The district court also found that the July 1 shareholders' letter was materially misleading in that it did not disclose that Datatab management preferred the CRC offer because of the employment guarantees and in that it failed to discuss the effect on the takeover contest of the CRC option.
 
 
 19
 This holding misinterprets management's obligation of disclosure. By referring to the Merger Agreement, the July 1 letter incorporated the proxy materials sent to Datatab shareholders which described the guarantees of employment negotiated by Adams, Gallaher and Lobel and thus disclosed their conflict of interest. We see no additional informational benefit accruing to shareholders by requiring the beneficiaries of such contracts to announce that they regard them favorably. In our view, Rule 14e-2, read in light of the Williams Act's purpose of insuring that "public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information," Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975), calls for a statement of why the shareholders should accept or reject a tender offer, based upon objective factual material. The highly subjective inquiry pursued by the district court assumes that boards of directors have monolithic viewpoints and threatens to burden the tender offer process with judicial oversight which yields little in the way of useful or new information but subjects tender offers to the delay inherent in judicial dockets. So long as any personal stake of any member of management is fully disclosed, the Rule 14e-2 disclosure may be limited to objective, non-misleading factual material.
 
 
 20
 As for the failure to state that the option, if valid, brought the takeover contest to an end, that conclusion is obvious to anyone conversant with elementary mathematics. We are also not inclined to subject every tender offer to a nit-picking judicial scrutiny which will in the long run injure shareholders by preventing them from taking advantage of favorable offers.
 
 
 21
 The disclosure required by the Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters. That was fulfilled by disclosure of the employment guarantees contained in the terms of the merger negotiated by Datatab's management and of the terms of the CRC option.
 
 CONCLUSION
 
 22
 For the foregoing reasons, the order of the district court is reversed.
 
 
 
 [1]
 Also attending this meeting were James Sheridan of Data Probe and defendant John Lobel of Datatab
 
 
 [2]
 Whether Section 14(e) implicitly creates a private cause of action under which a tender offeror may seek injunctive relief against the target company, its management, and other rivals in the takeover contest has not been decided by this court. The Supreme Court explicitly reserved this question in Piper v. Chris-Craft Industries, 430 U.S. 1, 47 n. 33, 97 S.Ct. 926, 952 n. 33, 51 L.Ed.2d 124 (1977). The defendants argued in the district court that Section 14(e) does not create such a cause of action but abandoned this contention on appeal, explicitly declining to argue it at oral argument. Lacking the benefit of briefs and argument on this major issue and noting that it does not affect the outcome, we will assume such a cause of action exists for purposes of this decision
 
 
 [3]
 Mite, of course, did not involve the application of fiduciary obligations of a contractual nature imposed by state law