Ramon RUFFIN, Defendant–
Below, Appellant,

v.

STATE of Delaware, Plaintiff–
Below, Appellee.

No. 56, 2015

Supreme Court of Delaware.

Submitted: October 7, 2015
Decided: December 3, 2015

Santino Ceccotti, Esquire, Office of Public Defender, Wilmington, Delaware, Attorney for Defendant–Below, Appellant.

John Williams, Esquire, Department of Justice, Dover, Delaware, Attorney for Plaintiff–Below, Appellee.

Before STRINE, Chief Justice; HOLLAND, and VALIHURA, Justices.

HOLLAND, Justice:

Ramon Ruffin was charged in an eleven-count indictment with the following offenses: one count of Attempted Robbery First Degree, three counts of Possession of a Firearm During Commission of a Felony ("PFDCF"), one count of Assault First Degree, one count of Aggravated Menacing, two counts of Possession of a Firearm

by a Person Prohibited ("PFBPP"),[1] one count of Receiving a Stolen Firearm, one count of Disregarding a Police Officer's Signal and one count of Resisting Arrest.

Following a jury trial, Ruffin was found guilty of Assault Second Degree, the lesser included offense of Assault First Degree. He was convicted him, as charged, of all other counts. Ruffin was declared a habitual offender pursuant to 11 *Del. C.* § 4214(a). He was sentenced to be incarcerated for a minimum of 113 years.

Ruffin raises four claims on appeal: (1) the trial court erred in admitting the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") trace report into evidence because it was inadmissible hearsay; (2) he was denied a fair trial due to improper, suggestive eyewitness identification; (3) the trial court erred in denying his request for a *Lolly*[2] instruction regarding the State's failure to test allegedly exculpatory evidence; and (4) he was prejudiced by cumulative error. We have concluded that all of Ruffin's claims are without merit. Therefore, the Superior Court's judgment of conviction must be affirmed.

### *Facts*

Robert Alan Cocozzoli is the owner of two McDonald's restaurant franchises in Dover, Delaware. On Monday afternoon, December 9, 2013, Cocozzoli was at his McDonald's restaurant located on the northbound side of U.S. Route 13. Cocozzoli was taking items outside to his Nissan Murano SUV parked on the south side of the restaurant.

As Cocozzoli was putting items into his car, a person approached from the rear asking for a cigarette. When Cocozzoli turned around, he heard, "Give me your wallet." At that point, he saw Ramon Ruffin pointing a gun at him.[3] The gun Ruffin was holding looked to Cocozzoli like a .45 caliber weapon.[4] After Ruffin's demand for Cocozzoli's wallet, Cocozzoli grabbed Ruffin's hand containing the gun and a struggle between the two men ensued in the parking lot. Ruffin struck Cocozzoli in the head several times with the gun.

While Cocozzoli was struggling with Ruffin, a Pepsi van operated by Robert Yaniak, Jr. pulled into the McDonald's parking lot. Yaniak saw Ruffin beating Cocozzoli in the face repeatedly with a gun. When Yaniak blew his van's horn, Ruffin was distracted from his attack on Cocozzoli and pointed the gun at Yaniak. Yaniak had stopped his van about twenty feet from the scene of the struggle. Yaniak saw Ruffin's face and thought Ruffin was going to shoot him.[5]

Yaniak then saw Ruffin run to the driver's side of a white Pontiac minivan. According to both Cocozzoli and Yaniak, Ruffin got into the driver's side of the van. The white Pontiac minivan backed out of a parking space in front of Yaniak, who

---

1. Ruffin filed a motion for severance as to both counts of PFBPP. The motion was granted.

2. *Lolly v. State,* 611 A.2d 956 (Del. 1992).

3. Cocozzoli identified Ruffin at trial as the individual who approached him in the McDonald's restaurant parking lot on the afternoon of December 9, 2013.

4. Cocozzoli was shown a Hi–Point .45 caliber semiautomatic handgun that the State admit-

ted at trial as State's Exhibit # 11. Cocozzoli confirmed that it looked like the gun Ruffin pointed at him.

5. Yaniak also identified Ruffin at trial as the individual he saw attacking Cocozzoli in the McDonald's parking lot and as the person who pointed a gun at Yaniak. Yaniak testified that Ruffin's gun was a black semiautomatic.

wrote down the vehicle's Delaware license plate number.

After Ruffin fled northbound on U.S. Route 13 in the minivan, Yaniak exited his vehicle. Cocozzoli told Yaniak to call 911. In his 911 call, Yaniak described Ruffin's getaway vehicle and gave the Delaware license plate number. Paramedics arrived at the McDonald's and transported Cocozzoli to Kent General Hospital in Dover. Cocozzoli had cuts on his face, ear, and cheek as a result of Ruffin's attack. Hospital X-rays revealed that Cocozzoli had cheek bone fractures.

A police radio broadcast notified patrolling officers to be on the lookout for a robbery suspect fleeing northbound on U.S. Route 13 in a white Pontiac minivan with Delaware license plate number 57722. The police broadcast described the robbery suspect as a black male with a handgun.

Dover Police Department Corporal Brian Sherwood was driving on Scarborough Road near U.S. Route 13 in north Dover, when he received the police radio broadcast of a robbery in progress. Corporal Sherwood drove his unmarked police car to U.S. Route 13 and headed southbound. Corporal Sherwood spotted the white Pontiac minivan as it passed him from the opposite direction proceeding northbound on U.S. Route 13. Corporal Sherwood verified the license plate number and observed a black male with a red jacket driving. Corporal Sherwood made a U-turn at Kentwood Drive and then drove northbound on U.S. Route 13 in pursuit.

The white Pontiac minivan also made a U-turn and proceeded southbound on U.S. Route 13 until it turned right into the entranceway for a Holiday Inn and another McDonald's restaurant. At this point, Corporal Sherwood activated the lights and siren on his police vehicle. The white Pontiac minivan attempted to elude the police by returning to U.S. Route 13 southbound, turning right into an old Wal–Mart store parking lot, driving on Crawford Carroll Road and then Scarborough Road before returning to U.S. Route 13.

During the circular police pursuit, Corporal Sherwood observed the white Pontiac minivan run three stop signs, sideswipe a Dodge Ram vehicle, and bump a red car several times in an effort to push that vehicle out of the way. Corporal Sherwood also observed a passenger inside the minivan. Other Dover Police vehicles joined in the highway pursuit of the minivan. At Ruffin's trial, the jury observed three DVDs taken by Dover Police in-car dash cameras of the police chase.

After retracing its route past the old Wal–Mart store a second time, the white Pontiac minivan drove across Scarborough Road into the DelTech campus. At this point, four Dover Police Officers (Brian Sherwood, Ian Thompson, Harvey Jaksch, and James Paul Piazza) were all in pursuit of the white Pontiac minivan. As the minivan attempted to exit from the DelTech campus to turn left onto Denneys Road, the minivan slid over a curb and became lodged on a metal post.

The backseat passenger of the white Pontiac minivan, later identified as Wilbur Doughty, jumped out and ran towards Denneys Road where he was apprehended by Dover Police. The driver of the minivan also fled by running east toward the DelTech buildings where he was also taken into custody. Corporal Sherwood, who apprehended Ruffin, identified Ruffin at trial as the driver of the white Pontiac minivan. Similarly, Dover Police Officer Harvey Jaksch identified Ruffin at trial as the man who exited the driver's side door of the minivan and who was chased down by Corporal Sherwood. After the apprehensions of Ruffin and Doughty, Corporal

Sherwood and Officer Jaksch observed a semiautomatic pistol on the minivan floor behind the front driver's seat.

Dover Police Department Crime Scene Investigator ("CSI") Lawrence Simpkiss went to the DelTech campus on December 9, 2013, after being advised of an incident involving a robbery with a gun and a police pursuit. CSI Simpkiss took several photographs of the white Pontiac minivan, and located a .45 caliber semiautomatic Hi-Point handgun behind the front driver's seat and in front of the rear passenger seat. The gun was loaded with one cartridge in the chamber and eight more shells in the magazine. The gun retrieved by CSI Simpkiss after the police chase was admitted without objection at trial as State's Exhibit # 11.

CSI Simpkiss found blood on the gun. CSI Simpkiss contacted the ATF for a trace report on the gun (the "ATF Report"). The ATF Report revealed that the gun was originally purchased on February 4, 2007 in Richmond, Virginia by Larry Alphonso Tucker. The ATF Report of the gun was admitted at trial as State's Exhibit # 12. A subsequent National Crime Information Center ("NCIC") search of the gun by Dover Police Detective Matthew Knight revealed that the gun had been reported as stolen.

Ruffin elected not to testify at his jury trial and the defense presented no witnesses.

### ATF Report Challenged

The first issued raised by Ruffin challenges the evidentiary basis for his conviction of receiving a stolen firearm in violation of 11 *Del. C.* § 1450. During Ruffin's trial the State sought to admit the ATF Report, a federal government report concerning the purchaser of the gun that the Dover State Police recovered from the white Pontiac minivan Ruffin was driving leading up to his apprehension. Outside the presence of the jury, the prosecutor explained the circumstances of how CSI Simpkiss obtained a copy of the ATF Report from the federal government. Defense counsel for Ruffin objected to admission of the ATF Report as written hearsay.

The issue at trial was whether the ATF Report qualified as an exception to the rule against hearsay under either Rule 803(6) of the Delaware Rules of Evidence ("D.R.E."), as a business record, or D.R.E. 803(8), as a public record or report. The prosecutor initially argued that the ATF Report should be admissible as a business record. The trial judge was not persuaded and stated: "So I don't think that a public agency is a business. So I don't think it comes in under [D.R.E. 803(6)]."

The trial judge then considered whether the ATF Report was admissible as a public record or report under D.R.E. 803(8). The trial judge concluded that a report from the ATF about the purchase of a firearm from a licensed dealer did not constitute a "finding of fact" but instead constituted a compilation of data. Accordingly, the trial judge stated: "So my ruling is that assuming that [CSI] Simpkiss can lay a proper foundation under 803(8), that [the ATF Report] comes in as a public record."

When defense counsel further argued that the ATF Report, which included gun purchase information, was an "investigative report" prepared by the federal government, the trial judge disagreed, stating:

> I just don't really agree that it's an investigative—that this one-page document is an investigative report. I think it's just a data compilation. It's a statement of data that's compiled. I just don't think it rises to the level of being an investigative report.

Following this evidentiary ruling, CSI Simpkiss appeared as the next prosecution witness. The gun that was recovered from the white Pontiac minivan Ruffin was driving was admitted without defense objection. CSI Simpkiss explained that his normal investigative procedure is to process a gun for fingerprints and DNA and conduct an ATF trace report on the gun.

CSI Simpkiss testified: "Basically if a firearm comes in with a serial number on it, I type in information into the ATF web page in effort to get a purchaser information on the gun. It will give me the last known legal purchase of the gun." CSI Simpkiss added that when someone purchases a gun, the transaction is reported to the ATF. In Ruffin's case, CSI Simpkiss requested an ATF trace report of the recovered gun. Three days after his request, CSI Simpkiss received the ATF Report.

CSI Simpkiss testified the ATF Report was the standard type of document he receives when he submits a request for an ATF trace report for a gun with a serial number. In this instance, the gun with serial number X460323 was purchased February 4, 2007 from Virginia Firearms and Transfers Incorporated in Richmond, Virginia. The 2007 handgun purchaser was *Larry Alphonso Tucker.* On the basis of his prior evidentiary ruling, the trial judge permitted the ATF Report to be admitted into evidence as State's Exhibit # 12.

### *Public Records' Admissibility*

D.R.E. 803(8) provides that the following public records are exceptions to the rule against hearsay, and therefore may be admissible:

[R]ecords, reports, statements or data compilations, in any form, of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.[6]

The rule further provides that the following public records do not fit within this exception to the hearsay rule, and therefore may *not* be admissible:

(A) Investigative reports by police and other law-enforcement personnel; (B) investigative reports prepared by or for a government, a public office or an agency when offered by it in a case in which it is a party; (C) factual findings offered by the government in criminal cases; (D) factual findings resulting from special investigation of a particular complaint, case or incident; (E) any matter as to which the sources of information or other circumstances indicate lack of trustworthiness.[7]

The comments to the Delaware Rules of Evidence state that D.R.E. 803(8) tracks the language of Rule 803(8) of the Uniform Rules of Evidence ("U.R.E."), a rule which, according to the comments, "was believed to be preferable over [Federal Rules of Evidence Rule] 803(8)." [8]

Indeed, D.R.E. 803(8) tracks the language of U.R.E. 803(8) with only minor variations in the text. There are no differences with regard to the content of the two rules. First, U.R.E 803(8) prefaces its public records exception to the rule against hearsay by requiring the source of information contained in the record to be trustworthy. Second, U.R.E. 803(8) was

---

**6.** D.R.E. 803(8).

**7.** *Id.*

**8.** D.R.E. 803 cmt.

amended to use the term "record" in lieu of the phrase "records, reports, statements or data compilations, in any form," a phrase which D.R.E. 803(8) still uses. The comment to U.R.E. 803(8) provides the reasoning behind this amendment.

The comment to U.R.E. 803(8) states that in "today's technological environment ... records are, or may be, kept in a variety of mediums other than just 'data compilations.'" Public records "do not consist solely of 'data compilations'" and the term "records" includes emails, electronic documents, physical documents, images, and information compiled in databases. The U.R.E. 803(8) amendment reflects an understanding that the term "records" naturally encompasses "reports, statements or data compilations" and it is therefore unnecessary to list all items. This minor stylistic change, however, does not alter the meaning or effect of the rule.

The language of Rule 803(8) of the Federal Rules of Evidence ("F.R.E.") is also similar to the language of D.R.E. 803(8) and U.R.E. 803(8). Although the comments to D.R.E. 803(8) indicate that "D.R.E. 803(8) tracks U.R.E. 803(8)," F.R.E. 803(8) contains the same essential provisions as the Delaware and Uniform Rules. Therefore, federal decisions interpreting F.R.E. 803(8) are didactic in our analysis of Ruffin's case.

F.R.E. 803(8) provides that a record or statement of a public office is not excluded by the rule against hearsay if:

(A) it sets out:

 (i) the office's activities; .

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel, or;

(iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

In summary, there are two basic features supporting the exclusion of public records from the rule against hearsay under each of the three standards (D.R.E., U.R.E., F.R.E.). First, public records from law-enforcement agencies that are investigative and have a focus toward litigation will not be admissible. Second, public records must be trustworthy to be admissible. Indeed, all three standards exclude public records from the rule against hearsay based on an understanding that reports prepared by the government are trustworthy.[9]

Trustworthiness can be established by showing that the public record was created pursuant to a legal duty.[10] Trustworthiness can also be established by other circumstances that the court finds reasonably sufficient.[11] Trustworthiness is questioned, however, if the public records were investigative or prepared by law-enforcement agencies with a focus toward litigation.

---

**9.** *See* JACK B. WEINSTEIN AND MARGARET A. BERGER, STUDENT EDITION OF WEINSTEIN'S EVIDENCE MANUAL § 16.02[2][a].

**10.** *See Duross v. State*, 494 A.2d 1265, 1270 (Del. 1985) ("Nor, do we find any reason in this case to doubt the trustworthiness of testimony concerning a report prepared pursuant to a statutory duty.") (applying D.R.E. 803(8)).

**11.** *See Hickson v. State*, 2003 WL 1857529, at *1 (Del. Apr. 7, 2003) ("[R]outine use of [Delaware's database of criminal justice information] renders [a report] sufficiently trustworthy.") (applying D.R.E. 803(8)).

## Delaware Precedents

Although this Court has not directly addressed the admissibility of ATF reports, D.R.E. 803(8) has been applied to a variety of public records that are similar to the ATF Report at issue here. In *Hickson v. State*,[12] this Court held that information regarding a vehicle's registration contained in the Delaware Criminal Justice Information System ("DELJIS"), a statewide database of criminal records, was admissible under D.R.E. 803(8).[13] This Court reasoned that the DELJIS is a state agency charged, under 11 *Del. C.* §§ 8601, 8602(3) and (4), with maintaining "an accurate and efficient criminal justice information system." [14] Under 21 *Del. C.* § 2101, the State's Division of Motor Vehicles is required to maintain records of vehicle registration.[15] Accordingly, we noted that, "[r]ead in tandem, these statutes reflect a State-imposed duty to record vehicle registration and the authorization to make such records available to [government] agencies." [16] Furthermore, we held that "police officers routinely use the DELJIS system in order to ascertain publicly stored information concerning motor vehicles" such that "the routine use of this public system renders it sufficiently trustworthy." [17]

In *Trawick v. State*,[18] this Court held that a certified court record of a prior conviction is a record from a public agency, and, as such, is a public record that may be admissible under D.R.E. 803(8).[19] We added that such records would be self-authenticating under D.R.E. 902(4) and (1).[20]

In *General Motors Corp. v. Grenier*,[21] this Court held that the Environmental Protection Agency's ("EPA") Gold Book report (the "Gold Book Report") was admissible under D.R.E. 803(8).[22] The EPA released the Gold Book Report in 1986 to advise auto mechanics who might be exposed to asbestos. The Gold Book Report explained what diseases mechanics might contract if they came in contact with asbestos and how to control their exposure to asbestos. The Gold Book Report cited thirty-seven sources of information, including articles by scientists, other EPA reports, and reports from other federal agencies.[23] We held that the Gold Book Report was sufficiently trustworthy, that the EPA had the authority to disseminate such information, and that the Gold Book Report set forth factual findings resulting from an investigation made pursuant to authority granted by law.[24] Therefore, the Gold Book Report was admissible into evidence.[25]

12. 2003 WL 1857529 (Del. Apr. 7, 2003).

13. *Id.* at *1.

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. 845 A.2d 505 (Del. 2004).

19. *Id.* at 509.

20. *Id.* D.R.E. 902(4) states that extrinsic evidence of authenticity of evidence is not required for copies of an official record or report if such records can be certified by complying with D.R.E. 902(1), (2), or (3). Under D.R.E. 902(1), records that bear the seal of the government will be deemed self-authenticated.

21. 981 A.2d 531 (Del. 2009).

22. *Id.* at 539.

23. *Id.*

24. *Id.*

25. *Id.*

### Federal Precedents

Federal courts have held specifically that ATF reports are public records and admissible under F.R.E. 803(8). In the criminal case of *United States v. Johnson*,[26] the Eighth Circuit examined the admissibility of an ATF report that contained a firearm's serial number and indicated that the firearm had traveled in interstate commerce.[27] The Eighth Circuit held that the ATF report was admissible under F.R.E. 803(8),[28] because the information contained in the ATF report was neither a "matter 'observed by law enforcement personnel,'" nor was the ATF report maintained in anticipation of the defendant's trial.[29] Rather, the ATF report was created pursuant to a statutory duty.[30]

In the civil case of *Augustson v. Holder*,[31] the District Court for the District of New Mexico held that ATF reports regarding violations of compliance rules and inspections were admissible under what was then F.R.E. 803(8)(C).[32] The text of F.R.E. 803(8)(C) was restructured in 2010 and is now F.R.E. 803(B)(iii).[33] The District Court found that F.R.E. 803(B)(iii) provides admissibility for government reports that, in civil cases, are limited to "factual findings resulting from an investigation made pursuant to authority granted by law."[34] Applying F.R.E. 803(b)(iii), the District Court held that the ATF reports at issue were made during the course of a compliance inspection pursuant to the Gun Control Act of 1968, and, as such, were admissible.[35]

### ATF Report Properly Admitted

 We hold that the ATF Report at issue in Ruffin's case is admissible under D.R.E. 803(8) as a public record. First, the record reflects that the information included in the ATF Report was gathered pursuant to a duty imposed by law. The Gun Control Act requires firearms dealers to fill out a transaction form, containing information about both the purchaser and the firearm, any time a firearm is sold.[36] Firearms dealers are under a legal duty to retain those forms for twenty years and to make such forms available to the ATF, essentially allowing the ATF to trace firearm sales.[37] Therefore, like the vehicle

26. 722 F.2d 407 (8th Cir. 1983).

27. *Id.* at 410.

28. *Id.*

29. *Id.* (quoting F.R.E. 803(8)).

30. *Id.*

31. 728 F.Supp.2d 1279 (D.N.M. 2010).

32. *Id.* at 1284.

33. U.S. JUDICIAL CONFERENCE, COMM. ON RULES OF PRACTICE & PROCEDURE, REPORT OF THE ADVISORY COMM. ON EVIDENCE RULES 67 (2010). The Committee Note to the restyled Rule 803 provides that:

> The language of Rule 803 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

*Id.* at 71.

34. *Augustson*, 728 F.Supp.2d at 1284.

35. *Id.*

36. 27 C.F.R. § 478.124. "The [Gun Control Act] requires a firearms dealer to fill out a 'Form 4473' ('Form') whenever a firearm is sold. The Form is used to record identifying information about gun purchasers and the firearms they purchase, which allows firearms to be traced and prevents transfer to persons prohibited from possessing firearms." *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 494 (7th Cir. 2006) (citing 27 C.F.R. § 478.124(c)(2)).

37. *See* 27 C.F.R. § 478.129(b).

record addressed by this Court in *Hickson*, the firearm record at issue in this case was created as a result of a legal duty imposed upon firearms dealers.[38]

Second, based on the above procedure and duty, the ATF Report cannot be deemed, under D.R.E. 803(8), to be an investigative report prepared by law enforcement with any focus toward litigation. As the trial judge found, the ATF Report "is not making a finding of fact. It's simply compiling data." Moreover, the ATF Report was not introduced into evidence to prove that Ruffin was in possession of a stolen firearm.

The actual trial evidence that the gun found in the white Pontiac minivan was stolen was provided by the next prosecution witness, Dover Police Detective Matthew Knight. Detective Knight testified that information that the gun, State's Exhibit # 11, was stolen came from the NCIC. Unlike information obtained from the ATF, information from the NCIC, such as details on stolen property, comes from a national database very similar to the DELJIS database discussed in *Hickson*.[39] Ruffin did not object to Detective Knight's testimony at trial.[40] Detective Knight's recital of his NCIC search is the only evidence that affirmatively showed that the gun in question was stolen. Thus, the ATF Report lends support to the charge of receiving a stolen firearm, but it was not, as Ruffin asserts, the "only credible evidence that Ruffin knowingly received a stolen firearm."

### Eyewitness Identifications Properly Admitted

On the first day of trial, Cocozzoli was asked during defense cross-examination if he had viewed the in-car videos taken from the police vehicles operated by Officers Thompson, Jaksch, and Piazza during the motor vehicle pursuit of Ruffin. Cocozzoli replied that he had not seen those videos, but "I saw two photographs today...." Cocozzoli explained that the prosecutor had shown him the two photographs. Ruffin's defense counsel then asked: "And [the Prosecutor] told you they were two individuals inside that white [Pontiac] minivan, right?"

On redirect examination of Cocozzoli, the prosecutor asked if his earlier in-court identification of Ruffin as his attacker was based on the photo of Ruffin he saw that morning, or if he had "a memory, a direct recollection, of seeing the defendant up close and personal between that one to two minute · attempted robbery?" Cocozzoli said his in-court identification of Ruffin was based on his memory "from the incident with the robbery."

In recross-examination, Ruffin's defense counsel returned to the photo display viewed on the day of trial but prior to Cocozzoli's testimony and asked, "And the reason [the Prosecutor] showed you the

---

**38.** Assuming that the ATF did not have possession of the transaction forms or relevant information, that does not render the report inadmissible. The information used to create the ATF Report is contained within ATF forms that distributors are under a legal duty to complete and maintain. *See* 27 C.F.R. § 478.124. Distributors are also under a legal duty to make these forms available to the ATF upon request. *See* 18 U.S.C. § 923(g) (2012). Thus, the relevant information on the disputed report comes from ATF forms maintained by entities that "observed [the transac-

tion] pursuant to [a] duty imposed by law and as to which there was a duty to report." D.R.E. 803(8).

**39.** *Hickson*, 2003 WL 1857529, at *1 ("[R]outine use of [the DELJIS database] renders it sufficiently trustworthy.").

**40.** The NCIC report was not introduced and Detective Knight's testimony is the only evidence of the NCIC search.

photo was to aid you in identifying [Ruffin], correct." Cocozzoli answered: "No. What he did was show me two photos. He asked me if I know the person that attacked me was one of the two people and I said 'Yes,' and I pointed it out."

The next witness for the State was Yaniak, the Pepsi van driver on the afternoon of the McDonald's parking lot attack. He also identified Ruffin in the courtroom as the man with the gun who was repeatedly beating Cocozzoli in the face with the weapon and as the man who later pointed the gun at Yaniak. On cross-examination, Ruffin's defense counsel asked witness Yaniak if he had viewed a photo of Ruffin on the morning of trial. Yaniak replied that "It was two photos."

Defense counsel then asked Yaniak, "What were you told?" Yaniak answered: "[The prosecutor] asked me if I could pick out which one of these was the—which one was [Ruffin]. [The Prosecutor] showed me two pictures of two different African American gentlemen, and he said which one was it. I said I knew by looking at it who it was." Ruffin's defense counsel then asked Yaniak, "So you knew that by process of elimination you had a fifty-fifty chance of getting it right. Correct?" Yaniak responded: "Yes. But I honestly couldn't forget." Defense counsel then asked, "So you couldn't forget, but you can't remember the color of the car?" Yaniak answered simply, "That's different." On redirect examination, the prosecutor inquired about the strength of Yaniak's memory as to the identity of the McDonald's attacker. Yaniak replied: "Some of it is unclear, but the alleged beating and the pointing the gun at me I'll never forget."

■■ No defense motion or objection was raised by defense counsel at the time of the in-court identifications of Ruffin by either Cocozzoli or Yaniak. Rather, six days after Cocozzoli's testimony, and four days after Yaniak's testimony, defense counsel for Ruffin moved for a mistrial, and conceded, "So we should have made that motion last week. I didn't." Ruffin's defense counsel argued that the display of photographs of the two white Pontiac minivan occupants at the time of the police pursuit was "highly suggestive." The State responded that the mistrial motion was untimely, and that the merits of the motion went "to the weight of the witnesses' in-court identification of the defendant." The prosecutor also clarified the record by adding:

> [T]hey were shown two photographs. I'll represent the other photograph was Wilbur Doughty, and they were asked as they were told, "Do you see the person that was involved in the case?" They both picked him out, and it was the defendant's photograph.

The trial judge denied the mistrial motion, and stated:

> I'm not persuaded that I should attempt to undue [sic] the testimony that the jury has already heard. I certainly don't think there is any grounds for a mistrial. I think you are raising an objection which, in my view, goes to the weight to be given to the evidence that we've just discussed, not its admissibility. So your request for a mistrial is denied.

Whether a mistrial motion should be granted lies within the trial judge's discretion.[41] A discretionary decision will be

---

41. *See Jones v. State*, 2013 WL 596379, at *2 (Del. Feb. 14, 2013) (finding that the trial judge did not abuse her discretion by denying defendant's Motion for a Mistrial despite witness's improper reference to "mug shots" used in photographic lineup); *Gomez v. State*, 25 A.3d 786, 793 (Del. 2011); *McNair v. State*, 990 A.2d 398, 403 (Del. 2010). The "trial

reversed on appeal only if it is based upon unreasonable or capricious grounds.[42]

■■■ "An identification procedure will not pass constitutional muster where it is impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[43] To violate due process, "the unnecessarily suggestive identification procedure must also carry with it the increased danger of an irreparable misidentification."[44] Whether an out-of-court identification is impermissibly suggestive is a fact-specific inquiry.[45] "An identification is suggestive when the police conduct it in such a way that the witness' attention is directed to a *particular* individual as the suspect upon whom the police have focused."[46]

In this case, the prosecutor showed Cocozzoli and Yaniak two photographs, one was a picture of Ruffin and the other of Wilbur Doughty. Cocozzoli testified that he could not remember if the prosecutor told him that these individuals were "the ones inside of the van." Yaniak, on the other hand, admitted that the prosecutor suggested that "one of these people were

[] on trial." Rather than using a traditional photograph lineup, the State employed an unnecessarily suggestive pretrial procedure.[47]

■■■ Even if a lineup is impermissibly suggestive, however, evidence of the identification will not be excluded at trial so long as the identification is reliable.[48] When determining if an identification procedure is impermissible, this Court must decide under the totality of the circumstances: (1) whether the procedure used was unnecessarily suggestive; and (2) whether there was a likelihood of misidentification.[49] In determining the reliability of the identification, the United States Supreme Court set forth the following five factors to consider:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[50]

judge is in the best position to assess the risk of any prejudice from trial events." *Copper v. State,* 85 A.3d 689, 692 (Del. 2014).

**42.** *See Revel v. State,* 956 A.2d 23, 27 (Del. 2008); *Zimmerman v. State,* 628 A.2d 62, 65 (Del. 1993).

**43.** *Younger v. State,* 496 A.2d 546, 550 (Del. 1985) (internal quotations omitted) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

**44.** *Id.* (citing *Manson v. Brathwaite,* 432 U.S. 98, 120, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).

**45.** *Weber v. State,* 38 A.3d 271, 277 (Del. 2012).

**46.** *U.S. ex rel. Goodyear v. Del. Corr. Ctr.,* 419 F.Supp. 93, 96 (D. Del. 1976) (emphasis added).

**47.** *See Burrell v. State,* 1999 WL 1192562, at *2 (Del. Sept. 28, 1999) (finding that viewing of a photo of the defendant "just prior to the in-court identification may have been unnecessarily suggestive."); *see also United States v. Field,* 625 F.2d 862, 869 (9th Cir. 1980) (finding that it was suggestive for an FBI agent to inform a witness that her tentative selection of two photographs had included one of the arrested suspect).

**48.** *State v. Sierra,* 2011 WL 1316151, at *3 (Del. Super. Apr. 5, 2011).

**49.** *Richardson v. State,* 673 A.2d 144, 147 (Del. 1996) (citing *Harris v. State,* 350 A.2d 768, 770 (Del. 1975)).

**50.** *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Having examined the identification evidence for these five indicia of reliability, a reviewing court is instructed to weigh their existence and extent "[a]gainst ... the corrupting effect of the suggestive identification itself."[51] By doing so, the reviewing court may judge whether the identification was the product of observations at the time of the crime or impressions made during the suggestive pretrial photographic identification process.[52]

 An application of the five factor test in *Manson v. Brathwaite* leads to a conclusion that the two separate in-court identifications of Ruffin were sufficiently reliable to be admissible.[53] Both Cocozzoli and Yaniak had an opportunity to view Ruffin in the daylight at the time of the crime, their attention was not distracted, there was no discrepancy from prior descriptions, and both were certain at trial about their identifications. Accordingly, the record reflects that there was no "manifest necessity" to grant defense counsel's belated motion for a mistrial based on a claim of an impermissibly suggested photo lineup in Ruffin's case.[54]

The record supports the trial judge's ruling that the objection goes to the weight to be given to the identification evidence and not to its admissibility. Defense counsel was free to argue about the effect of the photographic views of the two witnesses prior to their trial testimony, and he did so in closing argument. Ruffin's counsel argued to the jury: "... do you think there may be a possibility that the reason why Mr. Cocozzoli and Mr. Yaniak said it was Ramon Ruffin had anything to do with the photos they were shown? That's a question you need to answer on your own."

## Missing Evidence Instruction Properly Denied

Following the apprehension of Ruffin, CSI Simpkiss retrieved a Hi–Point .45 caliber semiautomatic handgun from the minivan Ruffin was driving. CSI Simpkiss later collected DNA swabbings from Ruffin and Doughty. In addition, CSI Simpkiss took DNA swabs from the gun, the gun magazine, and one bullet. No DNA testing was performed in the investigation, however, because the prosecutor did not request such testing. Ruffin's defense counsel also never requested any DNA testing of the gun.

At the jury prayer conference, Ruffin's defense counsel requested a missing evidence jury instruction pursuant to *Lolly v. State*, for the State's failure to conduct DNA testing of the seized gun.[55] The State opposed any missing evidence jury instruction. The trial judge denied the defense's request for a missing evidence instruction and ruled:

> Well, I don't think this is a missing evidence case. The State—you know, the decision—the State collects the evidence. The decision whether to test it is one that the State makes, which I think is within their discretion. They take that into account, the strength of their case, the cost of the examination, and with whatever factors are very relevant. I think that is a Department of Justice function. You could have asked for an

**51.** *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

**52.** *See Jones,* 2013 WL 596379, at *2.

**53.** *See Manson,* 432 U.S. at 114–16, 97 S.Ct. 2243.

**54.** "A trial judge should grant a mistrial only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'" *Steckel v. State,* 711 A.2d 5, 11 (Del. 1998).

**55.** *See id.* at 959–60.

order to have your expert test the DNA, couldn't you, if you really wanted to test it? So the request for DNA or missing evidence instruction is denied.

The State is required to collect and preserve evidence which is material to a defendant's guilt or innocence.[56] In Ruffin's case the State did collect and preserve the evidence, the gun and DNA swabs. Therefore, this was not a case where the police neglected to collect the evidence or preserve the evidence.

At issue is whether the State had a further obligation to perform the DNA testing. Delaware law is settled on this issue. The *Deberry* standard only requires that the State adequately gather and preserve physical evidence.[57] Testing of physical evidence seized by the police is not required.[58] The State's affirmative duty ends with the collection and preservation of that evidence.[59] Ruffin could have requested pretrial DNA testing of the seized handgun, but he did not do so.[60]

### Conclusion

The Superior Court's judgment of convictions is affirmed.

**56.** *Deberry v. State,* 457 A.2d 744, 751–52 (Del. 1983); *Lolly,* 611 A.2d at 959–60 (uncollected blood evidence); *Hammond v. State,* 569 A.2d 81, 85 (Del. 1989) (crash vehicle released prior to defense examination); *Bailey v. State,* 521 A.2d 1069, 1090 (Del. 1987).

**57.** *Deberry* 457 A.2d at 751–52.

**58.** *Anderson v. State,* 1999 WL 504332, at *3 (Del. Mar. 18, 1999).

**59.** *See Quill v. State,* 2014 WL 4536556, at *2 (Del. Sept. 12, 2014); *Davis v. State,* 2014 WL 3943100, at *2 (Del. Aug. 12, 2014) (gun not tested for DNA or fingerprints).

**60.** *Davis,* 2014 WL 3943100, at *2 (noting that the gun was not tested for DNA or fingerprints, but that the State had no duty to test the handgun).